UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, 2100 L. Street, N.W., Washington, D.C. 20037, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES FOOD AND DRUG ADMINISTRATION, 200 Independence Avenue, S.W., Washington, D.C. 20201, | ) ) ) ) ) ) |
| Defendant. | ) ) ) |

Civ. A. No. 05-01089 (RMU)

## DECLARATION OF BETTY B. DORSEY

I, Betty B. Dorsey, declare as follows:

1. I am the Director of the Division of Freedom of Information (DFOI), Office of

Management Programs, United States Food and Drug Administration (FDA), located in

Rockville, Maryland. In this capacity, I direct the operations of DFOI. My duties and

responsibilities include supervising the office that receives, processes, and responds to requests

for FDA records under the Freedom of Information Act (FOIA). At my direction, FDA

components search agency records systems under their control to identify documents and other

information that may respond to FOIA requests. FDA's components gather, review, and

determine whether the responsive records should be withheld under any applicable FOIA or

Privacy Act exemptions. If responsive documents are exempt from public disclosure under

FOIA, DFOI issues a denial letter to the requester under the signature of the Assistant

Commissioner for Public Affairs. I have held this position since March 31, 1996. I previously served as the Deputy Director of the FOI Staff from October 30, 1994 through March 30, 1996.

2. The statements made in this declaration are based upon my personal knowledge, information made known to me in my official capacity, and information available to me in my official capacity and about which I have become knowledgeable.

3. I submit this declaration in support of the government's motion for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C). The purpose of this declaration is to set forth DFOI's response to the FOIA request that is the subject of the Complaint in this case.

<u>CHRONOLOGY OF EVENTS</u>

4. By letter dated April 9, 2004, the Humane Society of the United States (Plaintiff) submitted a FOIA request to FDA. <u>See</u> Letter from Plaintiff to FDA (Apr. 9, 2004), Ex. 1. Plaintiff's request sought documents "related to FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (theraputic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA." <u>Id</u>. As with all FOIA requests received by FDA's Freedom of Information office, DFOI logged in this request and assigned it reference number 04-5590, reflecting that it was the 5,590th FOIA request FDA received during the calendar year 2004.

5. On April 19, 2004, FDA notified Plaintiff by letter that the agency would respond to Plaintiff's request "as soon as possible . . . ." <u>See</u> letter from FDA to Plaintiff (Apr. 19, 2004), Ex. 2. This letter also invited Plaintiff to contact FDA at a phone number and address provided therein if Plaintiff had any questions related to the request.

6. Given the size of the FDA and the vast number of documents generated in the ordinary course of agency business, DFOI forwards requests made under the FOIA to those FDA offices

that it determines are reasonably likely to possess responsive records.  In this case, DFOI

immediately forwarded Plaintiff's request to the Division of Information and Disclosure Policy

(DIDP) of the Center for Drug Evaluation and Research (CDER) and the Director of Regulations

and Policy of the Center for Food Safety and Applied Nutrition (CFSAN) on April 19, 2004.

DFOI referred Plaintiff's request to DIDP because CDER has regulatory responsibility for

BOTOX® and BOTOX® Cosmetic.  See Transfer of Therapeutic Products to the Center for

Drug Evaluation and Research, Ex. 3.  The request was referred to CFSAN because CFSAN's

responsibilities include the regulation of cosmetics.

       7.  On May 17, 2004, CFSAN sent Plaintiff copies of two documents maintained on

FDA's website concerning the cosmetic use of Botulinum Toxin Type A.  See Letter from

CFSAN to Plaintiff (May 17, 2004), Ex. 4.  CFSAN's cover letter to Plaintiff pointed out that

"Botox Cosmetic is considered to be a drug.  The use of the word Cosmetic in the name of the

drug does not refer to any cosmetic application but rather to the use of the drug for procedures

known as cosmetic surgery."  Id.  Plaintiff was charged $9.60 for search and reproduction costs

and informed that the total may not reflect the final charges associated with Plaintiff's request.

Id.  Because Plaintiff's request was still being processed by CDER, CFSAN's May 17, 2004

response to Plaintiff did not reflect the FDA's final response to Plaintiff's request.

       8.  On July 29, 2004, DFOI received a letter from Plaintiff that again requested

documents "related to the FDA's guidance on potency testing of the Butulinum toxin type A,

more specifically BOTOX® (theraputic use) and BOTOX® Cosmetic (cosmetic use),

manufactured by Allergan, Inc. of Irvine, CA."  See Letter from Plaintiff to FDA (Jul. 26, 2004),

Ex. 5.  Because the letter indicated that the Plaintiff had submitted a previous request for the

same documents and had received a response from CFSAN, DFOI did not assign it a new

reference number. Instead, it was considered to be a follow-up to the Plaintiff's original, pending, request. Plaintiff's July 26, 2004 letter was forwarded to CDER since Plaintiff's original April 9, 2004 FOIA request was still pending in that office.

9. By letter dated April 28, 2005, Plaintiff submitted a "Freedom of Information Act Appeal" to the Department of Health and Human Services wherein Plaintiff appealed the "constructive denial of a July 26, 2004 request" under FOIA. See Letter from Plaintiff to Dep't of Health and Human Servs. (Apr. 28, 2005), Ex. 6.

10. On May 5, 2005, the Department of Health and Human Services (Public Health Service, Freedom of Information Office) notified Plaintiff that its administrative appeal had been received and that it had been assigned number PHS-2K5-A-077. See Dep't of Health and Human Servs. letter to Plaintiff (May 5, 2005), Ex. 7.

11. On June 2, 2005, Plaintiff filed its Complaint in this case.

12. To date, FDA has neither denied, nor issued to Plaintiff a letter denying, its request for records with respect to FOIA request 04-5590; such request is still pending at CDER and will be processed when it rises to the top of DIDP's complex queue.

## THE PROCESSING OF FOIA REQUESTS BY DFOI STAFF

13. DFOI employs fifteen staff members who monitor the processing of all FOIA requests received by FDA. When a FOIA request arrives at FDA, DFOI staff log it into a computer tracking system, assign it a request number, and determine which FDA components are likely to have responsive documents. FDA is composed of five centers responsible for regulating foods, drugs, devices, biologics, and veterinary medicine, and numerous other offices. Each center has separate FOIA staff who are responsible for locating, organizing, reviewing, redacting,

and producing documents responsive to FOIA requests for products regulated by that center.

Most offices have at least one staff member who is trained to respond to FOIA requests.

14. Of the five FDA centers, CDER receives the largest share of FOIA requests each year. In calendar year 2004, about 25 percent of all FOIA requests received by FDA were directed to CDER. In calendar year 2003, about 31 percent of all FOIA requests received by FDA were directed to CDER. In calendar year 2002, about 28 percent of all FOIA requests received by FDA were directed to CDER.

15. FDA has improved its processes to meet its obligations under FOIA, including posting frequently requested records on FDA's website, contacting submitters of pending requests annually to determine whether they still desire documents (which enables FDA to clear some abandoned requests from queues throughout the agency), and undertaking increased FOIA training for personnel. For example, DFOI gives a two-day FOIA course semi-annually to FDA headquarters and field personnel, and offers specialized training for particular centers and offices (e.g., DFOI has trained FOI staff how to review and redact particular types of agency records).

16. However, the agency still has a substantial backlog of FOIA requests due to the high volume of requests that FDA receives, the complexity of these requests, and the amount of resources available to process requests.

17. FDA takes its responsibilities in the administration of its FOIA program very seriously. But the personnel resources of FDA components are insufficient to keep up with the large number of requests received, as well as the increased complexity of these requests. The time necessary to process a request cannot be significantly reduced without taking shortcuts that could threaten the legitimate interests of both the Government and the requester.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Betty B. Dorsey
Director
Division of Freedom of Information
Office of Management Programs
Food and Drug Administration

Executed on August 5, 2005, in Rockville, Maryland.

# Exhibit 1

# THE HUMANE SOCIETY
## OF THE UNITED STATES

**OFFICERS**
David O. Wiebers, M.D.
*Chair of the Board*
Anita W. Coupe, Esq.
*Vice Chair*
Amy Freeman Lee, Litt D
*Secretary*
Paul G. Irwin
*President, CEO*
Andrew N. Rowan, Ph.D
*Senior Vice President/Chief of Staff*
G. Thomas Waite III
*Treasurer, CFO*
Patricia A. Forkan
*Executive Vice President*
Roger A. Kindler, Esq
*Vice President/General Counsel*

**STAFF VICE PRESIDENTS**
Martha C. Armstrong
*Senior Vice President
Companion Animals
and Equine Protection*
John W. Grandy, Ph D
*Senior Vice President
Wildlife Programs*
Wayne Pacelle
*Senior Vice President
Communications and
Government Affairs*
Michael C. Appleby, B Sc, Ph D
*Farm Animals and
Sustainable Agriculture*
Kathenne Benedict
*Administration, Information
Services, and Technology*
Richard M. Clugston, Ph D
*Higher Education*
Randall Lockwood, Ph D
*Research and Educational Outreach*
Steve Putnam
*Business Development
and Corporate Relations*
Robert G. Roop, Ph D, SPHR
*Human Resources and Education*
Melissa Seide Rubin, Esq
*Field and Disaster Services*
Martin L. Stephens, Ph D
*Animal Research Issues*
Richard W. Swain Jr
*Investigative Services*
Gretchen Wyler
*Hollywood Office*

**DIRECTORS**
Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph D
Anita W. Coupe, Esq
Judi Friedman
Alice R. Garey
David John Jhirad, Ph D
Jennifer Leaning, M D
Amy Freeman Lee, Litt D
Franklin M. Loew, D V.M
Eugene W. Lorenz
Jack W. Lydman
William F. Mancuso
Patrick L. McDonnell
Judy J. Peil
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq
Marilyn G. Seyler
Maurice F. Strong, P.C, C C, LL.D
John E. Taft
David O. Wiebers, M D
Marilyn E. Wilhelm
K. William Wiseman

John A. Hoyt
*President Emeritus*

Murdaugh Stuart Madden, Esq
*Vice President/Senior Counsel*

NGO in general consultative status
with the Economic and Social Council
of the United Nations
Printed on recycled paper





April 9, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX®Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary. The documents should include, but not be limited to, any guidance that may specify or suggest that different methods are or may be permissible for the potency testing of BOTOX (therapeutic use) versus BOTOX Cosmetic (cosmetic use).

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,

*Loree Macdonald*

Loree Macdonald
Information Specialist
Animal Research Issues

HFD13 (Ob00
HFS22

# Exhibit 2

045590.txt

```
HUMANE SOCIETY                          04/19/04
ATTN: L MACDONALD
2100 L ST NW                            In reply refer to:
WASHINGTON, DC 20037                    04005590
```

Dear Requester:

The Food and Drug Administration (FDA) has received your
Freedom of Information Act (FOIA) request for records
regarding:

ALLERGAN INC, IRVINE, CA - BOTOX RECS

We will respond as soon as possible and may charge you a
fee for processing your request. If you have any questions
about your request, please call Mary L. Sejas, Lead
Information Technician, at 301-827-6563 or write to us at:

```
Food and Drug Administration
Division of Freedom of Information
5600 Fishers Lane, HFI-35
Rockville, MD 20857
```

If you call or write, use the reference number above
which will help us to answer your questions more quickly.

Page 1

# Exhibit 3

 

# U.S. Food and Drug Administration

## CENTER FOR BIOLOGICS EVALUATION AND RESEARCH

FDA Home Page | CBER A-Z Index | CBER Search | Contact CBER | CBER Home Page

**Blood | Vaccines | Cellular/Gene Therapy | Tissue | Devices**
**Products | Industry | Healthcare | Reading Room | Meetings | What's New**

# Transfer of Therapeutic Products
# to the Center for Drug Evaluation and Research

On June 30, 2003, FDA transferred some of the therapeutic biological products that had been reviewed and regulated by the Center for Biologics Evaluation and Research (CBER) to the Center for Drug Evaluation and Research (CDER). CDER now has regulatory responsibility, including premarket review and continuing oversight, over the transferred products. In regulating the products assigned to them, CBER and CDER will consult with each other regularly and whenever necessary.

On October 1, 2003, the staff comprising CBER's Office of Therapeutics Research and Review also transferred to CDER. CDER created two new offices to accommodate the former CBER staff:

- the Office of Drug Evaluation VI, within CDER's Office of New Drugs, and
- the Office of Biotechnology Products, within CDER's Office of Pharmaceutical Science.

For further information about the organizational structure of the two new offices in CDER, see www.fda.gov/cder/biologics/default.htm.

**Mailing addresses**

Beginning October 4, 2004, all **submissions for therapeutic biological products** (EXCLUDING 21 CFR 600.80 postmarketing adverse experience reports; advertising and promotional labeling; and 21 CFR 600.14 biological product deviation reports) **that have been transferred to CDER** should be sent to:

> CDER Therapeutic Biological Products Document Room
> Center for Drug Evaluation and Research
> Food and Drug Administration
> 12229 Wilkins Avenue
> Rockville, MD 20852

All **submissions for biological products that remain in CBER** should continue to be sent to:

> Center for Biologics Evaluation and Research
> Food and Drug Administration
> 1401 Rockville Pike, Suite 200N
> Rockville, MD 20852-1448

**The lists below identify categories of therapeutic biological products transferred from CBER to CDER, and categories of therapeutic biological products remaining in CBER.** Please note that the CBER list contains only a portion of the products CBER currently regulates; this list contains products that are closely related in chemical structure to products that transferred to CDER, e.g. therapeutic proteins and polysaccharides. Products are included on the CBER list as a means of clarifying the products that transferred and those that did not.

Product information for the product classes transferring to CDER have been relocated to the CDER web

site. A list of specific products transferring to CDER is provided.

Product information for the product classes remaining in CBER will remain on the CBER web site.

**Categories of Therapeutic Biological Products Transferred to CDER**

- Monoclonal antibodies for in-vivo use
- Proteins intended for therapeutic use, including cytokines (e.g. interferons), enzymes (e.g. thrombolytics), and other novel proteins, except for those that are specifically assigned to CBER (e.g., vaccines and blood products). This category includes therapeutic proteins derived from plants, animals, or microorganisms, and recombinant versions of these products
- Immunomodulators (non-vaccine and non-allergenic products intended to treat disease by inhibiting or modifying a pre-existing immune response)
- Growth factors, cytokines, and monoclonal antibodies intended to mobilize, stimulate, decrease or otherwise alter the production of hematopoietic cells in vivo [1]

**Categories of Therapeutic Biological Products Remaining in CBER**

- Cellular products, including products composed of human, bacterial or animal cells (such as pancreatic islet cells for transplantation), or from physical parts of those cells (such as whole cells, cell fragments, or other components intended for use as preventative or therapeutic vaccines)
- Vaccines (products intended to induce or increase an antigen specific immune response for prophylactic or therapeutic immunization, regardless of the composition or method of manufacture)
- Allergenic extracts used for the diagnosis and treatment of allergic diseases and allergen patch tests
- Antitoxins, antivenins, and venoms
- Blood, blood components, plasma derived products (for example, albumin, immunoglobulins, clotting factors, fibrin sealants, proteinase inhibitors), including recombinant and transgenic versions of plasma derivatives, (for example clotting factors), blood substitutes, plasma volume expanders, human or animal polyclonal antibody preparations including radiolabeled or conjugated forms, and certain fibrinolytics such as plasma-derived plasmin, and red cell reagents

**Combination Products**

The lists above contain some combination products comprised of a biological product component with a device and/or drug component, though such products are not specifically identified. Combination products are assigned to a Center for review and regulation in accordance with the products' primary mode of action. [2] When a product's primary mode of action is attributable to a type of biological product assigned to CDER, the product will be assigned to CDER. Similarly, when a product's primary mode of action is attributable to a type of biological product assigned to CBER, the product will be assigned to CBER. For further information about combination products, see http://www.fda.gov/oc/combination/, or contact the Office of Combination Products at 301-827-9229,or combination@fda.gov.

**Sponsor Information**

| | | | | |
|---|---|---|---|---|
| Files transfering to CDER | BLA | NDA | IND | IDE |
| Files remaining with CBER | BLA | NDA | IND | IDE |

Letter to Sponsors - (PDF), (Text)

FEDERAL REGISTER Food and Drug Administration Regulations; Drug and Biological Product Consolidation; Addresses; Final Rule; Technical Amendment - 3/24/2005 - (PDF), (Text)

FEDERAL REGISTER Drug and Biological Product Consolidation - **6/26/2003** - *(PDF)*, *(Text)*

Questions about the assignment of specific products to CBER or CDER should be directed to the center jurisdiction officers at:

CDER Ombudsman ......................... 301-594-5480

CBER Ombudsman ......................... 301-827-0379

---

**Footnotes**

[1]Growth factors, cytokines, and monoclonal antibodies intended to mobilize, stimulate, decrease or otherwise alter the production of hematopoietic cells in vivo, for the purpose of being harvested for use in the production of a therapeutic cellular or blood product, may be regulated in combination with the therapeutic cellular or blood product, as appropriate. Sponsors of products that fit this description should contact the center jurisdiction officers listed below for guidance on appropriate center assignment.

[2] See 21 U.S.C. § 353(g), section 503(g) of the Federal Food, Drug, and Cosmetic Act.

Updated May 24, 2005

---

CBER Home Page | CBER A-Z Index | CBER Search | Contact CBER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA / Center for Biologics Evaluation and Research

 

# U.S. Food and Drug Administration

## CENTER FOR BIOLOGICS EVALUATION AND RESEARCH

FDA Home Page | CBER A-Z Index | CBER Search | Contact CBER | CBER Home Page

**Blood | Vaccines | Cellular/Gene Therapy | Tissue | Devices**
**Products | Industry | Healthcare | Reading Room | Meetings | What's New**

## Transfer of Therapeutic Products to the Center for Drug Evaluation and Research

### Approved Products Transferring to CDER

| Product Name | Proprietary Name | Applicant Name |
|---|---|---|
| Abciximab | ReoPro | Centocor B.V. |
| Adalimumab | Humira | Abbott Laboratories |
| Agalsidase beta | Fabrazyme | Genzyme Corp |
| Aldesleukin | Proleukin | Chiron Corp |
| Alefacept | Amevive | Biogen, Inc |
| Alemtuzumab | Campath | ILEX Pharmaceuticals L.P. |
| Alteplase | Activase | Genentech, Inc |
| Anakinra | Kineret | Amgen, Inc |
| Anistreplase | Eminase | Wulfing Pharma GmbH |
| Arcitumomab | CEA-Scan | Immunomedics, Inc |
| Asparaginase | Elspar | Merck & Co., Inc |
| Basiliximab | Simulect | Novartis Pharmaceuticals Corp |
| Becaplermin | Regranex | OMJ Pharmaceuticals, Inc |
| Becaplermin Concentrate | | Chiron Corp |
| Botulinum Toxin Type A | BOTOX BOTOX COSMETIC | Allergan, Inc |
| Botulinum Toxin Type B | MYOBLOC | Elan Pharmaceuticals |
| Capromab Pendetide | ProstaScint | Cytogen Corp |
| Collagenase | Santyl | Advance Biofactures Corp |
| Daclizumab | Zenapax | Hoffmann-La Roche Inc |
| Darbepoetin alfa | Aranesp | Amgen, Inc |

| Denileukin diftitox | Ontak | Seragen, Inc |
|---|---|---|
| Dornase alfa | Pulmozyme | Genentech, Inc |
| Drotrecogin alfa (Activated) | Xigris | Eli Lilly & Co |
| Epoetin alfa | Epogen | Amgen, Inc |
| Epoetin alfa | Eprex | Ortho Biologics LLC |
| Etanercept | Enbrel | Immunex Corp |
| Filgrastim | Neupogen | Amgen, Inc |
| Ibritumomab tiuxetan | Zevalin | IDEC Pharmaceuticals Corp |
| Indium In-111 Chloride Sterile Solution | Indium In-111 Chloride Sterile Solution | Mallinckrodt Medical, Inc |
| Indium In-111 Chloride Sterile Solution | Indiclor | Medi-Physics, Inc |
| Infliximab | Remicade | Centocor, Inc |
| Interferon alfa-2a | Roferon A | Hoffmann-La Roche Inc |
| Interferon alfa-2b | Intron A | Schering Corp |
| Interferon alfacon-1 | Infergen | InterMune, Inc |
| Interferon alfa-n3 (Human Leukocyte Derived) | Alferon N Injection | Interferon Sciences, Inc |
| Interferon beta-1a | Avonex | Biogen, Inc |
| Interferon beta-1a | Rebif | Serono, Inc |
| Interferon beta-1b | Betaseron | Chiron Corp |
| Interferon gamma-1b | Actimmune | InterMune, Inc |
| Laronidase | Aldurazyme | Biomarin Pharmaceutical Inc |
| Muromonab-CD3 | Orthoclone OKT3 | Ortho Biotech Products, LP |
| Nofetumomab | Verluma | Boehringer Ingelheim Pharma KG |
| Omalizumab | Xolair | Genentech, Inc |
| Oprelvekin | Neumega | Genetics Institute, Inc |
| Palivizumab | Synagis | MedImmune, Inc |
| Pegaspargase | Oncaspar | Enzon, Inc |
| Pegfilgrastim | Neulasta | Amgen, Inc |
| Peginterferon alfa-2a | Pegasys | Hoffman-La Roche Inc |
| Peginterferon alfa-2b | PEG-Intron | Schering Corp |
|  |  |  |

| Rasburicase | Elitek | Sanofi-Synthelabo, Inc |
|---|---|---|
| Reteplase | Retavase | Centocor, Inc |
| Rituximab | Rituxan | Genentech, Inc |
| Rituximab Formulated Bulk (For Further Manufacturing Use) | | IDEC Pharmaceuticals Corp |
| Sargramostim | Leukine | Berlex Laboratories, Inc |
| Satumomab Concentrate (For Further Manufacturing Use) | | LONZA Biologics plc |
| Satumomab Pendetide | OncoScint CR/OV | Cytogen Corp |
| Streptokinase | Streptase | Aventis Behring GmbH |
| Tenecteplase | TNKase | Genentech, Inc |
| Tositumomab and Iodine I 131 Tositumomab | Bexxar | Corixa Corp |
| Trastuzumab | Herceptin | Genentech, Inc |
| Urokinase | Abbokinase | Abbott Laboratories - Pharmaceutical Products Division |

Updated July 2, 2003

CBER Home Page | CBER A-Z Index | CBER Search | Contact CBER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA / Center for Biologics Evaluation and Research

# Exhibit 4

03/31/2005 13:47 FAX                                              → HSUS LEGAL              @008



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**                    Public Health Service

Loree Macdonald                                            Food and Drug Administration
The Humane Society of the United States                    College Park, MD 20740
2100 L Street, NW
Washington, DC    20037

F04-5590

Dear Ms. Macdonald:

In response to your request of April 9, 2004 for information pertaining to
BOTOX (therapeutic use) and BOTOX Cosmetic (cosmetic use).

We wish to point out that Botox Cosmetic is considered to be a drug. The use of
the word Cosmetic in the name of the drug does not refer to any cosmetic application
but rather to the use of the drug for procedures known as "cosmetic surgery."

__xx__ Enclosed are the records you requested.

_____ We have searched our files and find no responsive information.

_____ Your request is also being referred to one of our component offices.

_____ In order to help reduce processing time and costs, certain material
has been deleted from the record(s) furnished to you because a pre-
liminary review of the records indicated that the deleted information is
not required to be publicly disclosed. If, however, you desire to
review the deleted material, please make an additional request at the
following address: Food and Drug Administration, Freedom of Information
Staff, HFI-35, 5600 Fishers Lane, Rockville, MD 20857. Should the
Agency then deny this information, you would have the right to appeal
such denial. Any letter of denial will explain how to make this appeal.

Charges will be included in a monthly invoice if your request(s) total
more than $15.00. If your monthly total is LESS than $15.00, the
material is free. Please DO NOT send payment until you receive an
invoice for the total monthly fee.

Reproduction $.60    Search $9.00    Review 0    Other    0    Total: $ 9.60

THE ABOVE TOTAL MAY NOT REFLECT THE FINAL CHARGES FOR THIS REQUEST.

Sincerely yours,

FOI OFFICER
Executive Operations Staff
Center for Food Safety
and Applied Nutrition

Enclosure

U.S. Food and Drug Administration
FDA Consumer magazine
July-August 2002
Table of Contents

Email this Page
To a Friend  Email

# Botox Cosmetic: A Look at Looking Good

*By Carol Lewis*

The promise of a more youthful look was too tempting for 53-year-old Mary Schwallenberg to pass up. So, when the Food and Drug Administration approved a product that temporarily improves the appearance of frown lines between the eyebrows, the Orlando, Fla., resident took a shot at it. And it wasn't long before she became one of many people clamoring for regular treatments that often include refreshments and friendly conversation, as well as injections.

Botulinum Toxin Type A (Botox Cosmetic) is a protein complex produced by the bacterium *Clostridium botulinum*, which contains the same toxin that causes food poisoning. When used in a medical setting as an injectable form of sterile, purified botulinum toxin, small doses block the release of a chemical called acetylcholine by nerve cells that signal muscle contraction. By selectively interfering with the underlying muscles' ability to contract, existing frown lines are smoothed out and, in most cases, are nearly invisible in a week.



How Botox Works

Botox injections are the fastest-growing cosmetic procedure in the industry, according to the American Society for Aesthetic Plastic Surgery (ASAPS). In 2001, more than 1.6 million people received injections, an increase of 46 percent over the previous year. More popular than breast enhancement surgery and a potential blockbuster, Botox is regarded by some as the ultimate fountain of youth.

Schwallenberg, a pharmaceutical sales representative who is excited about her next round of injections, says she wants to look her best for her job. "That's corporate America for you," she says. "I have a lot of energy and I just wanted to look good."

Botox was first approved in 1989 to treat two eye muscle disorders—uncontrollable blinking (blepharospasm) and misaligned eyes (strabismus). In 2000, the toxin was approved to treat a neurological movement disorder that causes severe neck and shoulder contractions, known as cervical dystonia. As an unusual side effect of the eye

disorder treatment, doctors observed that Botox softened the vertical frown (glabellar) lines between the eyebrows that tend to make people look tired, angry or displeased. But until this improvement was actually demonstrated in clinical studies, Allergan Inc., of Irvine, Calif., was prohibited from making this claim for the product.

By April 2002, the FDA was satisfied by its review of studies indicating that Botox reduced the severity of frown lines for up to 120 days. The agency then granted approval to use the drug for this condition.

The FDA regulates products, but not how they are used. Approved products are sometimes used by a licensed practitioner for uses other than those stated in the product label. Botox Cosmetic, for example, is currently being used by physicians to treat facial wrinkles other than those specified by the FDA. Consumers should be aware, however, that this "off-label" use has not been independently reviewed by the agency, and the safety and effectiveness of Botox injections into other regions of the face and neck, alone or in combination with the frown-lines region, have not been clinically evaluated.



Ella L. Toombs, M.D., a dermatologic medical officer in the FDA's Office of Cosmetics and Colors, says, "Careful deliberation, investigation and evaluation is undertaken by the agency before any prescription product is approved. Drugs such as Botox, which are not indicated for serious or life-threatening conditions, are subject to a greater level of scrutiny because of the benefit-to-risk ratio." Toombs says this means that the FDA may allow someone to incur a greater risk from products that treat medical conditions, rather than from those that are approved for cosmetic purposes.

## Botox 'Parties'

The recent rise in the popularity of Botox has much to do with the manner in which it is frequently marketed. Some practitioners buy the toxin in bulk and arrange get-togethers for people receiving their treatments. As in business, volume discounts can be found in medicine.

Plastic surgery events known as Botox parties—also seminars, evenings and socials—are a key element of Botox marketing in much of the United States. The gatherings are thought to be a convenient means of providing Botox treatments more economically, and may help reduce the anxiety that normally goes along with getting an injection. Doctors are finding that treating people in groups allows them to make the procedure more affordable to their patients.

Here's how a "party" typically works: A group of often nervous, but excited, middle-aged men and women mingle in a common area. Sometimes refreshments are served. One by one, as their name is called, each slips away for about 15 minutes to a private exam room. He or she pays a fee and signs an informed consent agreement. Anesthesia is rarely needed, but sedatives and numbing agents may be available. The practitioner injects about one-tenth of a teaspoon of toxin into specific muscles of

### Considering Botox Cosmetic?

- Be sure that a qualified doctor performs the procedure.
- Make sure that the doctor is trained and qualified in cosmetic skin surgery of the face.
- Ask questions and be informed about the benefits and risks involved in the procedure.
- Avoid alcohol and remain upright for several hours following the procedure.
- Choose a medical

the forehead most often targeted for the effect. The person then rejoins the group.

Scott A. Greenberg, M.D., a board-certified plastic surgeon in Winter Park, Fla., has been hosting monthly "Botox Happy Hours" in his medical office since the drug's approval in April. Greenberg feels that these by-invitation-only events to previous patients "are an opportunity to treat a lot of people at one time in a relaxed but professional atmosphere." Greenberg says there is no difference between treating 10 people during individual office visits throughout the day and treating 10 people individually, but in a more socialized setting. "The important thing is that the identical standards of medical care are maintained at these gatherings as in a routine daytime office consultation."

> setting using sterile techniques. Necessary equipment should be available to respond to any potential problems.
>
> *Source: The American Society for Dermatologic Surgery*

Julianne Clifford, Ph.D., of the FDA's Division of Vaccines and Related Products Applications, explains that "Botox is licensed for marketing and distribution as single-use vials." This means that as packaged, "each vial is intended to be used for a single patient in a single treatment session." Botox does not contain a preservative against potential contamination of the product through repeated use of a single vial. Once opened and diluted, Botox must be used within four hours. Treating multiple people with one vial violates product labeling, which is stated on the package insert, the vial and the carton.

"We lose something when we mass treat," says Franklin L. DiSpaltro, M.D., president of the ASAPS. "One of my concerns is that these parties are a marketing tool—gathering as many patients as possible trivializes a medical treatment, which could deteriorate over time into a nonprofessional environment." DiSpaltro says there's more to medicine "than just dispensing drugs."

Schwallenberg, however, insists that "Dr. Greenberg was very professional. It wasn't a cattle call," she says. "And I don't think I'd go to a doctor I didn't know."

The FDA is concerned that Botox has the potential for being abused. The ASAPS recently reported that unqualified people are dispensing Botox in salons, gyms, hotel rooms, home-based offices, and other retail venues. In such cases, people run the risks of improper technique, inappropriate dosages, and unsanitary conditions. "Botox is a prescription drug that should be administered by a qualified physician in an appropriate medical setting," says Toombs.

Greenberg agrees. "Patient safety has to be of prime concern," he says. "People need to be in the right hands when complications arise." That's why Greenberg does not allow his staff to administer Botox treatments. Even the most skilled health-care providers, he says, can have complications as well as dissatisfied customers.

Although there is no chance of contracting botulism from Botox injections, there are some risks associated with the procedure. If too much toxin is injected, for example, or if it is injected into the wrong facial area, a person can end up with droopy eyelid muscles (ptosis) that could last for weeks. This particular complication was observed in clinical trials.

03/31/2005 13:48 FAX                              HSUS LEGAL          @013

Botox Cosmetic: A Look at L   ng Good                              Page 4 of 4

Other common side effects following injection were headache, respiratory infection, flu
syndrome, and nausea. Less frequent adverse reactions included pain in the face,
redness at the injection site, and muscle weakness. These reactions were generally
temporary, but could last several months.

While the effects of Botox Cosmetic don't last, still, people don't seem to mind repeating
the procedure every four to six months in order to maintain a wrinkle-free look. Battling
the signs of aging in a non-invasive way, after all, is part of the allure of the product--that
and the fact that there are no unsightly scars, and that there is very little recovery time
with the procedure.

The FDA recommends that Botox Cosmetic be injected no more frequently than once
every three months, and that the lowest effective dose should be used.

## For More Information:

American Academy of Dermatology
P.O. Box 4014
Schaumburg, IL 60168-4014
1-888-462-3376

American Society for Dermatologic Surgery
5550 Meadowbrook Drive, Suite 120
Rolling Meadows, IL 60008
1-800-441-2737

American Society for Aesthetic Plastic Surgery
11081 Winners Circle
Los Alamitos, CA 90720
1-888-272-7711

Table of Contents | How to Subscribe | Back Issues | Editorial Questions
FDA Office of Public Affairs
Web page created by cb 2002-JUN-25

03/31/2005 13:49 FAX                              → HSUS LEGAL            ☒014

Fact sheet—Botox, Office of W    en's Health                                      Page 1 of 2

## FDA   U.S. Food and Drug Administration 

FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA

*TAKE TIME TO CARE*

GET HIGH-QUALITY
GRAPHIC VERSION (PDF)

# Botox™

Botox™ is used to improve the look of mild to severe frownlines for a short time.

## What is Botox™?

- Botox™ comes from a kind of bacteria. The bacteria can make you very sick. But doctors have found that the chemical in Botox™ can also help treat some health problems. They have been using it safely for many years.

## How does Botox™ work?

- Some wrinkles are caused when a muscle contracts (tightens up). Botox™ is injected through the skin into the muscle with a needle. The Botox™ keeps the muscle from contracting. When the muscle can't contract, the wrinkle doesn't show as much.

## You mean you can't move your muscles?

- A trained doctor will inject small amounts of Botox™ into a small part of the muscle. Only that muscle can't move.

## What happens over the long term?

- The action of Botox™ lessens with time. So the muscle returns to normal within a few months. You begin to see the wrinkle again.

## How was this found?

- Botox™ was approved by the FDA (Food and Drug Administration) over 10 years ago to treat certain diseases of the eye muscle. Doctors noticed that some wrinkles around the eyes looked better, too. The company that makes Botox™ tested it. They showed the FDA that Botox™ worked and was safe for treating certain types of wrinkles.

## Are there any side effects? Yes.

- Side effects may include:
- Droopy eyelids, which can last for a few weeks
- Flu-like symptoms
- Headache and nausea (upset stomach)

*(REMEMBER: Botox™ is a drug, not a cosmetic.)*

Are Botox Parties Safe?

03/31/2005 13:49 FAX                                          → HSUS LEGAL          ☒015

Fact sheet—Botox, Office of W ] en's Health                                    Page 2 of 2

> Botox™ is approved for selling in single-use tubes. Each tube is
> made to be used only once and only for one patient. Using the tube
> more than once can spread germs. Treating more than one person
> with one tube goes against the product directions. Also, Botox™
> needs to be used within 4 hours after the tube is opened.

## What should I do if I want to try Botox™?

- Make sure you get treatment in a doctor's office or hospital. Make sure your doctor is trained and "takes time to care."

## Thinking about Botox?

- Be sure that a skilled doctor does the treatment.
- Make sure the doctor is trained in cosmetic skin surgery of the face.
- Ask about the benefits and risks of the treatment.
- Choose a medical setting where everything is kept clean and germ-free.
- Emergency equipment should be on hand in case of a problem.
- Do not drink alcohol and do not lie down for several hours after the treatment.

To learn more:



American Academy of Dermatology Phone: 1-888-462-3376

American Society for Dermatologic Surgery Phone: 1-800-441-2737

FDA Talk Paper: "FDA Approves Botox To Treat Frown Lines"
www.fda.gov/bbs/topics/ANSWERS/2002/ANS01147.html

FDA Consumer article: "Botox Cosmetic: A Look at Looking Good"
www.fda.gov/fdac/features/2002/402_botox.html

*October 2003*

---

Get the Facts Index
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility

FDA Office of Women's Health

# Exhibit 5

# THE HUMANE SOCIETY
## OF THE UNITED STATES

**OFFICERS**
David O. Wiebers, M.D.
*Chair of the Board*
Anita W. Coupe, Esq.
*Vice Chair*
Amy Freeman Lee, Litt.D
*Secretary*
Paul G. Irwin
*President, CEO*
Andrew N. Rowan, Ph.D.
*Senior Vice President/Chief of Staff*
G. Thomas Waite III
*Treasurer, CFO*
Erika A. Fritsch
*Executive Vice President*
Roger A. Kindler, Esq.
*Vice President/General Counsel*

**STAFF VICE PRESIDENTS**
Martha C. Armstrong
*Senior Vice President
Companion Animals
and Equine Protection*
John W. Grandy, Ph.D.
*Senior Vice President
Wildlife Programs*
Wayne Pacelle
*Senior Vice President
Communications and
Government Affairs*
Michael C. Appleby, B.Sc., Ph.D.
*Farm Animals and
Sustainable Agriculture*
Katherine Benedict
*Administration, Information
Services, and Technology*
Richard M. Clugston, Ph.D.
*Higher Education*
Randall Lockwood, Ph.D.
*Research and Educational Outreach*
Steve Putnam
*Business Development
and Corporate Relations*
Robert G. Roop, Ph.D. SPHR
*Human Resources and Education*
Melissa Seide Rubin, Esq.
*Field and Disaster Services*
Martin L. Stephens, Ph.D.
*Animal Research Issues*
Richard W. Swain Jr.
*Investigative Services*
Gretchen Wyler
*Hollywood Office*

**DIRECTORS**
Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph.D.
Anita W. Coupe, Esq.
Judi Friedman
Alice R. Garey
David John Jhirad, Ph.D.
Jennifer Leaning, M.D.
Amy Freeman Lee, Litt.D.
Franklin M. Loew, D.V.M.
Eugene W. Lorenz
Jack W. Lydman
William F. Mancuso
Patrick L. McDonnell
Judy J. Peil
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn E. Seyler
Maureen F. Strong, P.C., Q.C., LL.D.
John E. Taft
David O. Wiebers, M.D.
Marion E. Wilhelm
K. William Wiseman
John A. Hoyt
*President Emeritus*
Murdaugh Stuart Madden, Esq.
*Vice President/Senior Counsel*

HSUS on general assembly status
with the Economic and Social Council
of the United Nations
Printed on recycled paper

July 26, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary.

This is the HSUS' second request for this information. Our initial request, dated April 9, 2004, yielded little pertinent information; rather, FDA sent two printouts from the internet that did not address any of our questions (see enclosures). Also, we have made several attempts to contact FDA employees by phone to discuss potency issues, but we have been unsuccessful. We would appreciate full disclosure of non-proprietary information relating to the potency testing of Botulinum toxin type A.

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,

*Loree Macdonald*

Loree Macdonald
Information Specialist
Animal Research Issues

Enc.

**Promoting the protection of all animals**
2100 L Street, NW, Washington, DC 20037 ▪ 202-452-1100 ▪ Fax: 202-778-6132 ▪ www.hsus.org

# Exhibit 6

# THE HUMANE SOCIETY
## OF THE UNITED STATES

**OFFICERS**

David O. Wiebers, M.D.
*Chair of the Board*
Anita W. Coupe, Esq.
*Vice Chair of the Board*
Eugene W. Lorenz
*Board Treasurer*
Wayne Pacelle
*President & CEO*
G. Thomas Waite III
*Treasurer & CFO*
Roger A. Kindler, Esq.
*General Counsel & CLO*

**STAFF VICE PRESIDENTS**

Andrew N. Rowan, Ph.D.
*Executive Vice President
Operations*
Michael Markarian
*Executive Vice President
External Affairs*
Patricia A. Forkan
*Senior Vice President
International Programs
& Regions*
Martha C. Armstrong
*Senior Vice President
Domestic Animal Programs*
John W. Grandy, Ph.D.
*Senior Vice President
Wildlife & Habitat Protection*
Heidi Prescott
*Senior Vice President
Campaigns*
Michael C. Appleby, B.Sc., Ph.D.
*Farm Animals*
Katherine Benedict
*Administration, Information
Services, & Technology*
Nicholas Braden
*Communications*
Richard M. Clugston, Ph.D.
*Higher Education*
Randall Lockwood, Ph.D.
*Research & Educational
Outreach*
Jonathan R. Lovvorn, Esq.
*Animal Protection Litigation*
Steve Putnam
*Business Development*
Robert G. Roop, Ph.D., SPHR
*Human Resources &
Education Programs*
Melissa Seide Rubin, Esq.
*Field & Disaster Services*
Martin L. Stephens, Ph.D.
*Animal Research Issues*
Richard W. Swain Jr.
*Investigative Services*
Gretchen Wyler
*Hollywood Office*

**DIRECTORS**

Leslie Lee Alexander
Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph.D.
Anita W. Coupe, Esq.
Neil Fang
Judi Friedman
Alice R. Garey
David John Jhirad, Ph.D.
Jennifer Leaning, M.D.
Eugene W. Lorenz
William F. Mancuso
Patrick L. McDonnell
Judy Ney
Judy J. Peil
Marian Probst
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Walter J. Stewart, Esq.
John E. Taft
David O. Wiebers, M.D.
K. William Wiseman

John A. Hoyt
Paul G. Irwin
*Presidents Emeriti*

Murdaugh Stuart Madden, Esq.
*Vice President & Senior Counsel*

Printed on 100% post-consumer recycled
paper, processed chlorine free and Green
Seal and FSC certified  with soy-based ink

2005 MAY -5  AM 10: 05
RECEIVED BY
PHSFOI OFFICE

RECEIVED
205 MAY -3  PM 1: 51
HHS-OASPA-FOI

PHS 2K5-A-077

April 28, 2005

Bill Pierce
Deputy Assistant Secretary for Public Affairs
Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

              Re:    **Freedom of Information Act Appeal**

Dear Mr. Pierce

     The Humane Society of the United States (The HSUS) hereby appeals the
constructive denial of a July 26, 2004 request under the Freedom of Information
Act, 5 U.S.C. § 552 <u>as amended</u> for copies of "all documents related to the FDA's
guidance on potency testing of the Botulinum toxin type A, more specifically
BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured
by Allergan, Inc. of Irvine, CA. (Attachment A).

     Pursuant to the Freedom of Information Act (FOIA) and the FDA's own
regulations, the agency has 20 working days to respond to a FOIA request.  21
CFR §20.41 (2005).  To date, The HSUS has received no response to this request.

     The HSUS sent a similar FOIA request on April 09, 2004, (Attachment B)
to which it received a partial response consisting of two documents printed off the
FDA website.  The first one is found at
http://www.fda.gov/womens/gethefacts/botox.html, and the second one is found
at http://www.fda.gov/fdac/features/2002/402_botox.html. (Attachment C).  The
information provided in these two web documents is very general and does not
address the request which specifically asks for "regulations, directives, policy
statements, recommendations, guidance documents, and similar documents."
The HSUS did not appeal the FDA's inadequate response to the April 9, 2004
request.  Rather, The HSUS sent a new request on July 26, 2004.  It is that request
that has gone entirely unanswered.

**Promoting the protection of all animals**
2100 L Street, NW, Washington, DC 20037 ▪ 202-452-1100 ▪ Fax: 202-778-6132 ▪ www.hsus.org

Accordingly, The HSUS hereby appeals the agency's constructive denial of this FOIA request. The HSUS does not seek proprietary information or information that falls under any other exemption covered by FOIA, and there is no justifiable basis for the agency withholding this information. Furthermore, this information is vital to The HSUS's ongoing monitoring of animal research in the United States, and its attempts to make sure individual companies are complying with the Animal Welfare Act, 7 U.S.C. § 2141 *et seq.* The agency's delay in providing access to such information frustrates what the Supreme Court has identified as the "basic policy" of the FOIA, *i.e.*, to "shed[] light on an agency's performance of its statutory duties." Dept. of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 774 (1989).

The HSUS would like to make arrangements to obtain all of the requested information as soon as possible. However, if, within twenty working days, the agency has not made arrangements to provide us with the requested records, we will assume that this appeal has been denied, and that our only remaining recourse is to file an action in federal district court to seek an order compelling disclosure.

Please let me know if you have any questions regarding this appeal.

Sincerely,

Peter J. Peterson
Deputy Director
Animal Protection Litigation

Enc.

2

# ATTACHMENT A

# THE HUMANE SOCIETY
## OF THE UNITED STATES.

OFFICERS

David O. Wiebers, M.D.
Chair of the Board

Anita W. Coupe, Esq.
Vice Chair

Amy Freeman Lee, Litt.D
Secretary

Paul G. Irwin
President, CEO

Andrew N. Rowan, Ph.D.
Senior Vice President/Chief of Staff

G. Thomas Waite III
Treasurer, CFO

Susan A. Fricke
Executive Vice President

Roger A. Kindler, Esq.
Vice President/General Counsel

STAFF VICE PRESIDENTS

Martha C. Armstrong
Senior Vice President
Companion Animals
and Equine Protection

John W. Grandy, Ph.D.
Senior Vice President
Wildlife Programs

Wayne Pacelle
Senior Vice President
Communications and
Government Affairs

Michael C. Appleby, B.Sc., Ph.D.
Farm Animals and
Sustainable Agriculture

Katherine Benedict
Administration, Information
Services, and Technology

Richard M. Clugston, Ph.D.
Higher Education

Randall Lockwood, Ph.D.
Research and Educational Outreach

Steve Putnam
Business Development
and Corporate Relations

Robert G. Roop, Ph.D. SPHR
Human Resources and Education

Melissa Seide Rubin, Esq.
Field and Disaster Services

Marion L. Stephens, Ph.D.
Animal Research Issues

Richard W. Swain Jr.
Investigative Services

Gretchen Wyler
Hollywood Office

DIRECTORS

Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph.D.
Anita W. Coupe, Esq.
Judi Friedman
Alice R. Garey
David John Jhirad, Ph.D.
Jennifer Leaning, M.D.
Amy Freeman Lee, Litt.D.
Franklin M. Loew, D.V.M.
Eugene W. Lorenz
Jack W. Lydman
William F. Mancuso
Patrick L. McDonnell
Judy J. Peil
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn E. Seyler
Marianne F. Strnad, P.C., O.C., LL.D.
John E. Taft
David O. Wiebers, M.D.
Marilyn E. Wilhelm
K. William Wiseman

John A. Hoyt
President Emeritus

Murdaugh Stuart Madden, Esq.
Vice President/Senior Counsel

July 26, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary.

This is the HSUS' second request for this information. Our initial request, dated April 9, 2004, yielded little pertinent information; rather, FDA sent two printouts from the internet that did not address any of our questions (see enclosures). Also, we have made several attempts to contact FDA employees by phone to discuss potency issues, but we have been unsuccessful. We would appreciate full disclosure of non-proprietary information relating to the potency testing of Botulinum toxin type A.

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,

Loree Macdonald
Information Specialist
Animal Research Issues

Enc.

Promoting the protection of all animals
2100 L Street, NW, Washington, DC 20037 ▪ 202-452-1100 ▪ Fax: 202-778-6132 ▪ www.hsus.org

# ATTACHMENT B

April 9, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary. The documents should include, but not be limited to, any guidance that may specify or suggest that different methods are or may be permissible for the potency testing of BOTOX (therapeutic use) versus BOTOX Cosmetic (cosmetic use).

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,


Loree Macdonald
Information Specialist
Animal Research Issues

**ATTACHMENT C**

03/31/2005 13:47 FAX                                    → HSUS LEGAL            @008



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**                Public Health Service

                                                           Food and Drug Administration
                                                           College Park, MD 20740
Loree Macdonald
The Humane Society of the United States
2100 L Street, NW
Washington, DC   20037

                              F04-5590

Dear Ms. Macdonald:

In response to your request of  April 9, 2004     for information pertaining to
BOTOX (therapeutic use) and BOTOX Cosmetic (cosmetic use).

We wish to point out that Botox Cosmetic is considered to be a drug. The use of
the word Cosmetic in the name of the drug does not refer to any cosmetic application
but rather to the use of the drug for procedures known as "cosmetic surgery."


   xx Enclosed are the records you requested.

   ____ We have searched our files and find no responsive information.

   ____ Your request is also being referred to one of our component offices.

   ____ In order to help reduce processing time and costs, certain material
has been deleted from the record(s) furnished to you because a pre-
liminary review of the records indicated that the deleted information is
not required to be publicly disclosed.  If, however, you desire to
review the deleted material, please make an additional request at the
following address:  Food and Drug Administration, Freedom of Information
Staff, HFI-35, 5600 Fishers Lane, Rockville, MD 20857.  Should the
Agency then deny this information, you would have the right to appeal
such denial.  Any letter of denial will explain how to make this appeal.

Charges will be included in a monthly invoice if your request(s) total
more than $15.00.  If your monthly total is LESS than $15.00, the
material is free.  Please DO NOT send payment until you receive an
invoice for the total monthly fee.

Reproduction $.60   Search $9.00  Review  0    Other   0   Total: $ 9.60

THE ABOVE TOTAL MAY NOT REFLECT THE FINAL CHARGES FOR THIS REQUEST.

                         Sincerely yours,


                         FOI OFFICER
                         Executive Operations Staff
                         Center for Food Safety
                         and Applied Nutrition


Enclosure

U.S. Food and Drug Administration
FDA Consumer magazine
July-August 2002
Table of Contents

Email this Page
To a Friend  

# Botox Cosmetic: A Look at Looking Good

*By Carol Lewis*

The promise of a more youthful look was too tempting for 53-year-old Mary Schwallenberg to pass up. So, when the Food and Drug Administration approved a product that temporarily improves the appearance of frown lines between the eyebrows, the Orlando, Fla., resident took a shot at it. And it wasn't long before she became one of many people clamoring for regular treatments that often include refreshments and friendly conversation, as well as injections.



Botulinum Toxin Type A (Botox Cosmetic) is a protein complex produced by the bacterium *Clostridium botulinum*, which contains the same toxin that causes food poisoning. When used in a medical setting as an injectable form of sterile, purified botulinum toxin, small doses block the release of a chemical called acetylcholine by nerve cells that signal muscle contraction. By selectively interfering with the underlying muscles' ability to contract, existing frown lines are smoothed out and, in most cases, are nearly invisible in a week.

Botox injections are the fastest-growing cosmetic procedure in the industry, according to the American Society for Aesthetic Plastic Surgery (ASAPS). In 2001, more than 1.6 million people received injections, an increase of 46 percent over the previous year. More popular than breast enhancement surgery and a potential blockbuster, Botox is regarded by some as the ultimate fountain of youth.

Schwallenberg, a pharmaceutical sales representative who is excited about her next round of injections, says she wants to look her best for her job. "That's corporate America for you," she says. "I have a lot of energy and I just wanted to look good."

Botox was first approved in 1989 to treat two eye muscle disorders—uncontrollable blinking (blepharospasm) and misaligned eyes (strabismus). In 2000, the toxin was approved to treat a neurological movement disorder that causes severe neck and shoulder contractions, known as cervical dystonia. As an unusual side effect of the eye

Botox Cosmetic: A Look at Lc  .ng Good                                              Page 2 of 4

disorder treatment, doctors observed that Botox softened the vertical frown (glabellar) lines between the eyebrows that tend to make people look tired, angry or displeased. But until this improvement was actually demonstrated in clinical studies, Allergan Inc., of Irvine, Calif., was prohibited from making this claim for the product.

By April 2002, the FDA was satisfied by its review of studies indicating that Botox reduced the severity of frown lines for up to 120 days. The agency then granted approval to use the drug for this condition.

The FDA regulates products, but not how they are used. Approved products are sometimes used by a licensed practitioner for uses other than those stated in the product label. Botox Cosmetic, for example, is currently being used by physicians to treat facial wrinkles other than those specified by the FDA. Consumers should be aware, however, that this "off-label" use has not been independently reviewed by the agency, and the safety and effectiveness of Botox injections into other regions of the face and neck, alone or in combination with the frown-lines region, have not been clinically evaluated.

Ella L. Toombs, M.D., a dermatologic medical officer in the FDA's Office of Cosmetics and Colors, says, "Careful deliberation, investigation and evaluation is undertaken by the agency before any prescription product is approved. Drugs such as Botox, which are not indicated for serious or life-threatening conditions, are subject to a greater level of scrutiny because of the benefit-to-risk ratio." Toombs says this means that the FDA may allow someone to incur a greater risk from products that treat medical conditions, rather than from those that are approved for cosmetic purposes.

## Botox 'Parties'

The recent rise in the popularity of Botox has much to do with the manner in which it is frequently marketed. Some practitioners buy the toxin in bulk and arrange get-togethers for people receiving their treatments. As in business, volume discounts can be found in medicine.

Plastic surgery events known as Botox parties—also seminars, evenings and socials—are a key element of Botox marketing in much of the United States. The gatherings are thought to be a convenient means of providing Botox treatments more economically, and may help reduce the anxiety that normally goes along with getting an injection. Doctors are finding that treating people in groups allows them to make the procedure more affordable to their patients.

Here's how a "party" typically works: A group of often nervous, but excited, middle-aged men and women mingle in a common area. Sometimes refreshments are served. One by one, as their name is called, each slips away for about 15 minutes to a private exam room. He or she pays a fee and signs an informed consent agreement. Anesthesia is rarely needed, but sedatives and numbing agents may be available. The practitioner injects about one-tenth of a teaspoon of toxin into specific muscles of

### Considering Botox Cosmetic?

- Be sure that a qualified doctor performs the procedure.
- Make sure that the doctor is trained and qualified in cosmetic skin surgery of the face.
- Ask questions and be informed about the benefits and risks involved in the procedure.
- Avoid alcohol and remain upright for several hours following the procedure.
- Choose a medical

the forehead most often targeted for the effect. The person then rejoins the group.

Scott A. Greenberg, M.D., a board-certified plastic surgeon in Winter Park, Fla., has been hosting monthly "Botox Happy Hours" in his medical office since the drug's approval in April. Greenberg feels that these by-invitation-only events to previous patients "are an opportunity to treat a lot of people at one time in a relaxed but professional atmosphere." Greenberg says there is no difference between treating 10 people during individual office visits throughout the day and treating 10 people individually, but in a more socialized setting. "The important thing is that the identical standards of medical care are maintained at these gatherings as in a routine daytime office consultation."

setting using sterile techniques. Necessary equipment should be available to respond to any potential problems.

*Source: The American Society for Dermatologic Surgery*

Julianne Clifford, Ph.D., of the FDA's Division of Vaccines and Related Products Applications, explains that "Botox is licensed for marketing and distribution as single-use vials." This means that as packaged, "each vial is intended to be used for a single patient in a single treatment session." Botox does not contain a preservative against potential contamination of the product through repeated use of a single vial. Once opened and diluted, Botox must be used within four hours. Treating multiple people with one vial violates product labeling, which is stated on the package insert, the vial and the carton.

"We lose something when we mass treat," says Franklin L. DiSpaltro, M.D., president of the ASAPS. "One of my concerns is that these parties are a marketing tool—gathering as many patients as possible trivializes a medical treatment, which could deteriorate over time into a nonprofessional environment." DiSpaltro says there's more to medicine "than just dispensing drugs."

Schwallenberg, however, insists that "Dr. Greenberg was very professional. It wasn't a cattle call," she says. "And I don't think I'd go to a doctor I didn't know."

The FDA is concerned that Botox has the potential for being abused. The ASAPS recently reported that unqualified people are dispensing Botox in salons, gyms, hotel rooms, home-based offices, and other retail venues. In such cases, people run the risks of improper technique, inappropriate dosages, and unsanitary conditions. "Botox is a prescription drug that should be administered by a qualified physician in an appropriate medical setting," says Toombs.

Greenberg agrees. "Patient safety has to be of prime concern," he says. "People need to be in the right hands when complications arise." That's why Greenberg does not allow his staff to administer Botox treatments. Even the most skilled health-care providers, he says, can have complications as well as dissatisfied customers.

Although there is no chance of contracting botulism from Botox injections, there are some risks associated with the procedure. If too much toxin is injected, for example, or if it is injected into the wrong facial area, a person can end up with droopy eyelid muscles (ptosis) that could last for weeks. This particular complication was observed in clinical trials.

Other common side effects following injection were headache, respiratory infection, flu syndrome, and nausea. Less frequent adverse reactions included pain in the face, redness at the injection site, and muscle weakness. These reactions were generally temporary, but could last several months.

While the effects of Botox Cosmetic don't last, still, people don't seem to mind repeating the procedure every four to six months in order to maintain a wrinkle-free look. Battling the signs of aging in a non-invasive way, after all, is part of the allure of the product--that and the fact that there are no unsightly scars, and that there is very little recovery time with the procedure.

The FDA recommends that Botox Cosmetic be injected no more frequently than once every three months, and that the lowest effective dose should be used.

## For More Information:

American Academy of Dermatology
P.O. Box 4014
Schaumburg, IL 60168-4014
1-888-462-3376

American Society for Dermatologic Surgery
5550 Meadowbrook Drive, Suite 120
Rolling Meadows, IL 60008
1-800-441-2737

American Society for Aesthetic Plastic Surgery
11081 Winners Circle
Los Alamitos, CA 90720
1-888-272-7711

Table of Contents | How to Subscribe | Back Issues | Editorial Questions

FDA Office of Public Affairs
Web page created by clb 2002-JUN-25.

Fact sheet—Botox, Office of W    en's Health                    Page 1 of 2

 **U.S. Food and Drug Administration** 

FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA

*TAKE TIME TO CARE*

| GET HIGH-QUALITY
| GRAPHIC VERSION [PDF] |

# Botox™

Botox™ is used to improve the look of mild to severe frownlines for a short time.

## What is Botox™?

- Botox™ comes from a kind of bacteria. The bacteria can make you very sick. But doctors have found that the chemical in Botox™ can also help treat some health problems. They have been using it safely for many years.

## How does Botox™ work?

- Some wrinkles are caused when a muscle contracts (tightens up). Botox™ is injected through the skin into the muscle with a needle. The Botox™ keeps the muscle from contracting. When the muscle can't contract, the wrinkle doesn't show as much.

## You mean you can't move your muscles?

- A trained doctor will inject small amounts of Botox™ into a small part of the muscle. Only that muscle can't move.

## What happens over the long term?

- The action of Botox™ lessens with time. So the muscle returns to normal within a few months. You begin to see the wrinkle again.

## How was this found?

- Botox™ was approved by the FDA (Food and Drug Administration) over 10 years ago to treat certain diseases of the eye muscle. Doctors noticed that some wrinkles around the eyes looked better, too. The company that makes Botox™ tested it. They showed the FDA that Botox™ worked and was safe for treating certain types of wrinkles.

## Are there any side effects? Yes.

- Side effects may include:
- Droopy eyelids, which can last for a few weeks
- Flu-like symptoms
- Headache and nausea (upset stomach)

*(REMEMBER: Botox™ is a drug, not a cosmetic.)*

| Are Botox Parties Safe? |

Fact sheet--Botox, Office of W〕en's Health                              Page 2 of 2

> Botox™ is approved for selling in single-use tubes. Each tube is made to be used only once and only for one patient. Using the tube more than once can spread germs. Treating more than one person with one tube goes against the product directions. Also, Botox™ needs to be used within 4 hours after the tube is opened.

## What should I do if I want to try Botox™?

- Make sure you get treatment in a doctor's office or hospital. Make sure your doctor is trained and "takes time to care."

## Thinking about Botox?

- Be sure that a skilled doctor does the treatment.

- Make sure the doctor is trained in cosmetic skin surgery of the face.

- Ask about the benefits and risks of the treatment.

- Choose a medical setting where everything is kept clean and germ-free.

- Emergency equipment should be on hand in case of a problem.

- Do not drink alcohol and do not lie down for several hours after the treatment.

### To learn more:



American Academy of Dermatology Phone: 1-888-462-3376

American Society for Dermatologic Surgery Phone: 1-800-441-2737

FDA Talk Paper: "FDA Approves Botox To Treat Frown Lines"
www.fda.gov/bbs/topics/ANSWERS/2002/ANS01147.html

FDA Consumer article: "Botox Cosmetic: A Look at Looking Good"
www.fda.gov/fdac/features/2002/402_botox.html

*October 2003*

---

Get the Facts Index
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility

FDA Office of Women's Health

# Exhibit 7



**DEPARTMENT OF HEALTH & HUMAN SERVICES**     Program Support Center

Public Health Service
Freedom of Information Office
Parklawn Building, Room 17-A-46
5600 Fishers Lane
Rockville, MD 20857
PH: 301-443-5252
Fax: 301-443-0925

May 5, 2005

PETER J. PETERSAN
THE HUMANE SOCIETY OF THE UNITED STATES
2100 L ST NW
WASHINGTON DC 20037

Dear PETER J. PETERSAN:

This is to acknowledge receipt of your administrative appeal dated 4/28/2005.

Any questions regarding the status of your appeal should be directed to the Public Health Services (PHS) Freedom of Information (FOI) office.

Your appeal has been assigned the following number PHS-2K5-A-077.

Please reference this number on your correspondence.

Sincerely,

PHS Freedom of Information Office