UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES, 2100 L Street, N.W., Washington, D.C. 20037, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civ. A. No. 05-01089 (RMU) |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES FOOD AND DRUG ADMINISTRATION, 200 Independence Avenue, S.W., Washington, D.C. 20201, | ) ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF NANCY B. SAGER

I, Nancy B. Sager, declare as follows:

1. I am the Director of the Division of Information Disclosure Policy (DIDP), Center for Drug Evaluation and Research (CDER), United States Food and Drug Administration (FDA), in Rockville, Maryland.

2. I have supervisory authority over DIDP, which processes and responds to requests for documents in the possession of CDER made pursuant to the Freedom of Information Act (FOIA) and/or third-party subpoenas. DIDP is also responsible for proactively reviewing, redacting, and posting on the FDA website, pursuant to the 1996 Electronic Freedom of Information Act Amendments (EFOIA), documents anticipated to be frequently requested, such as drug approval packages and warning letters. In addition, DIDP responds to requests for documents made by the U.S. Congress, foreign, state and local governments, other federal agencies, and to court orders

for CDER documents.

3. At my direction, FDA personnel search records systems for documents under CDER's control to identify records and other information that may respond to particular requests. DIDP staff gather and review potentially responsive documents to determine whether, before being made available for public disclosure, they should be redacted in part or in their entirety, under any applicable FOIA exemption, other statutory provision, or, in the context of third-party subpoenas, any applicable privilege. DIDP also reviews and, in certain circumstances, redacts non-disclosable information from documents that respond to Congressional document requests.

4. The statements made in this declaration are based upon my personal knowledge, information made known to me in my official capacity, and information available to me in my official capacity and about which I have become knowledgeable.

5. I submit this declaration in support of the government's motion for a stay of proceedings pursuant to 5 U.S.C. § 552(a)(6)(C). The purpose of this declaration is to: (a) describe DIDP's processing of FOIA and other requests; (b) give an account of DIDP's current workload for all requests for information, including related litigation; (c) explain the current backlog of FOIA requests and the efforts to reduce that backlog; (d) describe the events to date with respect to the Humane Society of the United States' (Plaintiff's) FOIA request; and (e) describe the steps that would be required to respond to Plaintiff's request for documents.

REQUEST PROCESSING BY DIDP

6. DIDP consists of twenty-six people: a Director, one Special Assistant, two team leaders, nine regulatory counsels, four consumer safety officers (CSOs), one policy analyst, seven paralegals and FOIA technicians, and one secretary. Currently, CDER DIDP employs four full-

2

time contractors who assist in producing documents in litigation matters, reviewing documents, and processing FOIA requests.

7. Initially, all FOIA requests for FDA documents are received by FDA's main Freedom of Information office, the Division of Freedom of Information (DFOI), Office of Management Programs. DFOI logs in each request, assigns it a number, and refers it to the agency components responsible for records relevant to the request. CDER is the center within FDA that is responsible for the regulation of most human drugs and therapeutic biological products. FOIA requests referred to CDER are sent to DIDP.

8. Requests that can be answered quickly with readily available documents and that require no redacting are considered "simple" requests and generally are processed on a fast track (the "simple queue"), as opposed to "complex" requests, which follow a slower processing track (the "complex queue"). DIDP staff generally process requests within the simple and complex queues on a first-in, first-out basis.

9. Simple requests do not require DIDP personnel to redact documents, generally because DIDP has already reviewed and redacted the responsive documents,[1] the documents requested are publicly available, or it is apparent from the face of the request that the documents do not exist in CDER's records.

10. Any requests that are not considered simple are placed in the complex queue. If DIDP anticipates that a FOIA request in the complex queue will require extensive searches for numerous documents, then multiple individuals in DIDP are assigned to the request. Complex

---

[1] Documents may fall into this category because they have been assembled and redacted in response to a prior FOIA request or because the request involves a drug approval package that DIDP has already finished processing in preparation for its posting on the FDA website.

requests that require this level of staffing often involve voluminous records and frequently

necessitate extensive time for searching and redaction in order to prepare the records for release.[2]

Furthermore, such requests often require substantive input from supervisory staff to determine

both the scope of the search and the ultimate releasability of the records.[3]

11. DIDP's response to a simple queue FOIA request principally involves making copies

of previously processed documents and providing them to the requester, directing the requester to

publicly available documents, or providing the requester with a statement that CDER does not

have documents responsive to the request.

12. For complex requests, DIDP may need to search, or contact individuals and direct

them to search, numerous agency files. After the search has been carried out and the documents

sent to DIDP, DIDP conducts a preliminary review of the records collected to verify that they are

responsive to the request. DIDP then conducts a page-by-page, line-by-line review of the

responsive documents to determine whether any records can be released and whether any FOIA

---

[2] For example, a FOIA request submitted on February 13, 2002, and assigned reference number 02-03279, sought documents concerning the drug Oxycontin. After completing an exhaustive search, DIDP located approximately 10,000 pages of responsive documents, including: approval documents for the new drug application; correspondence pertaining to the FDA's review and approval of the drug; approval documents relating to various supplements to the manufacturer's drug application; and other correspondence between FDA and the manufacturer.

[3] To promote efficiency in its operations, DIDP uses the following approaches in processing requests: (1) once a response to the oldest request for certain records comes to the top of the queue, responses to requests seeking closely related records are processed at the same time; and (2) once a response to a request for certain records is complete, any other requests for the same records are then answered at that time, regardless of where the additional requests are in the queue. This means that some requestors may initially receive a partial response to their requests, but it permits DIDP to more effectively use its limited resources in providing at least some documents to other requestors.

exemptions apply. Any exempt material is redacted. Frequently, a team leader conducts a quality control review to ensure that the responsive documents have been properly prepared for public disclosure. This review ensures that the FOIA exemptions have been properly applied, that no releasable material has been withheld, and that no material meriting protection has been released. Finally, copies of the responsive documents are prepared and delivered to the requester.

13. If the documents are being prepared in response to a complex request that is the subject of litigation (such as Plaintiff's request), all responsive documents are bates-stamped and indexed before the review and redaction process begins. After the review and redaction process is completed, DIDP staff update the index to reflect all redactions and the corresponding claims of exemption, and prepare a Vaughn index.

14. It is not always efficient to complete one request before moving on to the next. DIDP personnel therefore often work on more than one request at a time. Processing of a complex request may be delayed for a variety of reasons, such as resolving which exemptions apply, locating missing records, or consulting with other government agencies about the propriety of releasing certain documents. In the interest of efficiency during this waiting period, another request may be processed and, if work on it is completed, the responsive records will be released at that time. Therefore, large requests often proceed alongside smaller requests in the complex queue in an attempt to ensure that one requester does not consume a disproportionate share of DIDP resources. This approach likewise reduces the processing time for many FOIA requests.

## DIDP'S WORKLOAD

15. FDA regulates more than $1 trillion of commerce each year. Its jurisdiction includes drugs, foods, animal feeds, biologics, veterinary medicines, and medical devices. A byproduct of

5

the wide scope of the agency's activities is a massive volume of FOIA requests.

16. In 2004, approximately twenty-five percent of all FOIA requests for FDA documents were directed to DIDP. DIDP received 6,690 FOIA requests in 2001, 5,628 FOIA requests in 2002, 5,310 requests in 2003, 5,156 requests in 2004, and 2,420 requests as of July 31, 2005.

17. In 2004, DIDP received an average of about 430 FOIA requests per month. However, this figure does not reflect the size and complexity of the requests, and DIDP's resources were not sufficient to process as many requests as it received in 2004. The vast majority of documents that are responsive to FOIA requests include information that is exempt from disclosure (for example, trade secret information, confidential commercial information, personal privacy and/or deliberative process information). In addition, many of the FOIA requests that DIDP receives actually consist of multiple requests for documents. For example, a FOIA request submitted on April 7, 2005, and assigned reference number 05-5449, actually consists of twenty individual, itemized requests for documents. Although the requests all relate to the same drug product, they each pertain to a specific subset of documents relating to that drug product, and there may be thousands of pages of documents responsive to each of the twenty requests, which are nevertheless counted as one request for queue purposes.

18. Despite having issued more than 5,900 FOIA responses in 2001, 4,900 responses in 2002, 4,340 responses in 2003, 6,800 responses in 2004, and 2,654 responses through July 31, 2005, DIDP has a backlog of approximately 4,800 FOIA requests.

19. In addition, DIDP must comply with the EFOIA by proactively reviewing, redacting, and posting on FDA's website certain drug approval packages and warning letters. DIDP makes available hundreds of thousands of pages of documents each year regarding newly approved

drugs. Although these EFOIA activities reduce the number of incoming FOIA requests each year, they nevertheless require considerable upfront resources from DIDP.

20. Currently, DIDP is also responsible for responding to four third-party subpoenas, three of which currently require substantial document production. The remaining third-party subpoena will require substantial document productions in the near future. These productions require a significant time commitment by DIDP personnel, in that DIDP must review at least 200,000 pages of documents to respond to these subpoenas. These document productions are discussed in greater detail in the following paragraph.

21. A. In In re: Schering-Plough Corp. Securities Litigation, Master File No. 01-CV-0829 (D.N.J.), a third-party subpoena was served on FDA in November 2002. Since that time, CDER DIDP has produced approximately 2,600 pages of documents from FDA's field offices and 5,000 pages from CDER's Office of Compliance. The current phase of DIDP's document production in this matter focuses on approximately 45,000 pages of potentially responsive documents from CDER's Office of Compliance, which are being produced on a staggered basis, pursuant to an agreement with the requester. In addition to the documents from CDER's Office of Compliance, CDER DIDP may be required to produce additional documents from other CDER offices.

B. In Robert L. Garber, on Behalf of Himself and All Others Similarly Situated v. Pharmacia Corp., et al., Case No. 03-1519 (D.N.J.), a third-party subpoena was served on FDA in June 2004. The subpoena requests eighteen categories of documents concerning the efficacy, gastrointestinal safety, or possible gastrointestinal side effects of Celebrex and any possible gastrointestinal advantages or disadvantages of Celebrex compared to other drugs, including all

documents related to a certain Celebrex study, several news and journal articles, government

investigations, public statements, press releases, and news articles whether actual or

contemplated, and any financial contracts or agreements. The current phase of DIDP's document

production in this matter focuses on approximately 4,000 pages of documents that will be

produced on a staggered basis commencing in August 2005 pursuant to an agreement with the

requester.

      C. In <u>Zyprexa Plaintiff's Steering Committee v. Food and Drug Administration</u>,

Case No. 8:05-CV-01052 (for <u>In Re: Zyprexa Products Liability Litigation</u>, MDL Docket No.

1596 (E.D.N.Y)), a third-party subpoena was served on FDA on or about August 11, 2004. The

subpoena requests sixteen categories of documents concerning the approval, safety, effectiveness,

advertising, marketing, promotion, or use of Zyprexa. Pursuant to an agreement with counsel,

DIDP has committed to start searching for responsive documents in September 2005.

      D. In <u>Walson v. Merck & Co.</u>, Case No. 04-CV-00027 (S.D. Ill.), a third-party

subpoena was served on FDA on or about September 22, 2004. The subpoena requests fifteen

categories of documents concerning the approval, safety, effectiveness, advertising, marketing,

promotion, or use of Vioxx. The current phase of DIDP's document production in this matter

focuses on approximately 35,000 pages of documents produced in response to Congressional

requests, which are being produced on a staggered basis, pursuant to an agreement with the

requester. In addition to the documents produced to Congress, DIDP has agreed to produce

additional CDER documents on a staggered basis.

    22. Another huge part of DIDP's workload recently has been a significant increase since

2004 in the resources it devotes to document requests made by Congress, foreign, state and local

governments, and other federal agencies. These requests are not made under FOIA and are processed separate and apart from the FOIA queues. As a result, fewer resources have been available for responding to FOIA requests. One DIDP employee has been dedicated to responding to these document requests since August 2004, and DIDP has had to devote additional personnel resources on a number of occasions. For example, since August 2004, DIDP has produced for Congress over 100,000 pages relating to selective serotonin reuptake inhibitors (commonly referred to as "SSRIs"), COX-2 inhibitor drugs, and the participation by the elderly in clinical drug trials.

23. In summary, DIDP's current workload includes: a stream of new FOIA requests at the rate of approximately 430 per month; a backlog of approximately 4,800 FOIA requests; four subpoenas; proactive postings pursuant to EFOIA; and responding to requests for documents made by Congress, foreign, state and local governments, and other federal agencies. This workload has resulted in substantial processing delays.

DIDP BACKLOG AND RESPONSIVE ACTION

24. Because of the extraordinary demands on its resources, DIDP was unable to respond to Plaintiff's FOIA request within the statutory time limit. Apart from the approximately 430 FOIA requests that DIDP typically receives each month, DIDP staff has additional demands on its time. These include responding to subpoenas, document productions in FOIA lawsuits, responding to Congressional document requests, proactive postings on FDA's website pursuant to EFOIA, and other disclosure-related activities.

25. DIDP has taken aggressive steps to reduce its backlog of FOIA requests. In June 2001, DIDP was transferred from CDER's Office of Training and Communications to the Office

of Regulatory Policy (ORP). At the time of the transfer, DIDP had approximately fifteen staff

members. This transfer to ORP provided additional visibility and resources to the division, and it

increased DIDP's overall efficiency. DIDP received additional funds in 2002 and hired another

paralegal, a project specialist, a secretary, and seven full-time contractors to help redact and

produce documents for litigation and drug approval packages for website posting. Currently,

DIDP has four full-time contractors.

26. Also in 2001, CDER implemented a new filing system known as the Division Files

System (DFS), and DIDP integrated this filing system into its document retrieval function. DFS

eliminates the paper document search for certain documents and instead allows electronic

searches. This relatively new capability has reduced the time required to process FOIA requests.

27. In September 2003, DIDP started to implement organizational changes to increase

the efficiency of its operations, including establishing a three-team structure and analyzing and

adjusting work loads. DIDP also sought and obtained funding for an additional seven, full-time

positions. DIDP began filling these positions in October 2003. This hiring effort increased

DIDP staffing by more than thirty percent from 2002 to 2003 and approximately doubled DIDP's

staffing from its 2001 level. DIDP plans to hire approximately two more employees in the near

future. DIDP had 21 full-time employees before the September 2003 implementation of its

organizational changes and expects to have approximately 28 employees by December 2005.

Unfortunately, however, the hiring of new employees generally does not immediately result in

decreased processing times and decreased backlogs, because as a result of the extremely complex

nature of the work and the analysis necessary to process document requests, the average

employee requires one to two years to become fully productive. Nonetheless, the organizational

changes and hiring effort have already had a measurable impact on DIDP's backlog. DIDP's

backlog of pending FOIA requests has decreased from an August 2003 high of 6,783, to the

current backlog of approximately 4,800 requests. This equates to a decrease of approximately

thirty percent. DIDP expects that its ongoing process improvement activities and its future hires

will continue to help it reduce its backlog.

PLAINTIFF'S REQUEST

28. By letter dated April 9, 2004, Plaintiff submitted a FOIA request to FDA seeking,

"...documents related to the FDA's guidance on potency testing of the Botulinum toxin type A,

more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use)

manufactured by Allergan, Inc. of Irvine, CA." See Letter from Plaintiff to FDA (Apr. 9, 2004),

Ex. 1. On April 19, 2004, DFOI received this request, logged it in, assigned it reference number

04-5590, and forwarded it to DIDP. See letter from FDA to Plaintiff (Apr. 19, 2004), Ex. 2. The

request was forwarded to DIDP because the responsibility for the regulation of most therapeutic

biological products including BOTOX (Botulinum toxin type A) was transferred in October 2003

from FDA's Center for Biologics Evaluation and Research ("CBER") to CDER. See Transfer of

Therapeutic Products to the Center for Drug Evaluation and Research, Ex. 3. On April 21, 2004,

DIDP received FOIA request 04-5590 and assigned it to the complex queue. This request is still

in the complex queue and will be processed as soon as it moves to the head of the queue.

29. On July 26, 2004, DFOI received a letter from Plaintiff that requested the same

documents that were requested in Plaintiff's April 9, 2004 request. See Letter from Plaintiff to

FDA (Jul. 26, 2004), Ex. 4. Plaintiff's July 26, 2004 letter was forwarded to CDER because

Plaintiff's original April 9, 2004 FOIA request was, and is, still pending in DIDP.

30. On June 2, 2005, Plaintiff filed its Complaint seeking to compel production of the records sought in FOIA request 04-5590.

## STEPS REQUIRED TO PROCESS PLAINTIFF'S REQUEST

31. Plaintiff's request will require agency staff to search the numerous volumes of documents in the Biologic License Application (BLA), supplemental BLAs, and Investigational New Drug Applications, for Botulinim Toxin Type A manufactured by Allergan, Inc. ("Allergan"). There are hundreds of such volumes, with each volume expected to contain between 50 and 200 pages. In addition to searching the volumes of documents of applications that have been approved, agency staff must search the volumes of any applications that were not approved, were withdrawn, or are pending. Once Plaintiff's request rises to the head of the complex queue, DIDP estimates that it will require approximately one month to search for and locate all documents responsive to Plaintiff's request.

32. A search for the documents responsive to Plaintiff's request will be especially difficult to gather because of the October 2003 CBER-CDER reorganization (discussed in paragraph 28). Responsive documents may be present in both CBER and CDER; therefore, both centers will have to be searched.

33. For complex requests such as Plaintiff's which are involved in litigation, once DIDP has assembled all of the potentially responsive documents and files, it must review them to determine whether they are, in fact, responsive.

34. After all of the responsive documents have been identified, DIDP must follow its standard procedure for requests of this type, including: indexing and bates-stamping the documents; a page-by-page, line-by-line review of the documents for applicable exemptions;

12

redaction of exempt materials; quality control review; re-indexing the documents to include asserted exemptions; and copying.

35. Documents responsive to Plaintiff's request may contain exempt information. Some of the applicable exemptions that DIDP is likely to encounter are listed below, in paragraphs 36-37.

36. The Federal Food, Drug, and Cosmetic Act prohibits the release of trade secret material to persons other than Department of Health and Human Services employees, to Congress, or to the courts in cases brought under the Federal Food, Drug, and Cosmetic Act. 21 U.S.C. § 331(j). In addition, the Trade Secrets Act prohibits the release of trade secret information unless otherwise authorized by law. See 18 U.S.C. § 1905. Moreover, FDA regulations provide that trade secret and privileged or confidential commercial information are not available for public disclosure. 21 C.F.R. § 20.61. Documents responsive to Plaintiff's request are related to the chemistry, manufacturing, and controls of Allergan's Botulinim Toxin Type A. Therefore, the documents may contain significant amounts of trade secret and confidential commercial information. Correspondence to the sponsor, minutes of meetings and teleconferences with the sponsor, and FDA reviews of Allergan's Botulinim Toxin Type A, are examples of anticipated responsive documents likely to contain this protected type of information.

37. Plaintiff's request may encompass documents that were prepared by FDA and that relate to, among other things, the decision to recommend a particular method of potency testing. The documents may contain extensive information that is exempt from disclosure under the deliberative process privilege, which protects pre-decisional communications that are part of a

13

government agency's decision making process. See 21 C.F.R. § 20.62. DIDP redacts deliberative process information from responsive documents before they are released, except in those instances when FDA determines that waiver of this privilege is appropriate. FDA intra-agency memoranda and e-mails are examples of anticipated responsive documents likely to contain this protected type of information.

38. After documents are located, DIDP estimates that it will take an additional month to review and redact documents responsive to FOIA request 04-5590. All disclosable information will be made available to Plaintiff at the end of this process.

39. DIDP recognizes the importance of processing its requests and complying with the deadlines set forth under the FOIA. Regrettably, compliance with these deadlines is often not possible. Fortunately, DIDP expects that its ongoing process improvement activities and current hiring initiatives will continue to help it reduce its FOIA backlog. But even with these measures, Plaintiff's pending request will require additional time to complete.

40. For the foregoing reasons, I submit this declaration in support of FDA's request for a stay of proceedings. Consistent with DIDP's practice of processing requests on a first-in and first-out basis, DIDP estimates that it will be at least eight months before Plaintiff's FOIA request 04-5590 comes to the head of the complex track, and that it will take at least two months (one month to search for and locate the documents and one month to review and redact the documents) to process the request (i.e., an estimated completion date in June 2006).

14

41. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

NANCY B. SAGER
Director, Division of Information
Disclosure Policy
Center for Drug Evaluation and Research
Food and Drug Administration

Executed on August 10th, 2005, in Rockville, Maryland.

15

# Exhibit 1

# THE HUMANE SOCIETY
## OF THE UNITED STATES



*04 5590*

RECEIVED
APR 9 2004
FDA FOI STAFF (HFI-30)

FEE WAIVER
REQUESTED

**OFFICERS**

David O. Wiebers, M.D.
*Chair of the Board*

Anita W. Coupe, Esq.
*Vice Chair*

Amy Freeman Lee, L.H.D.
*Secretary*

Paul G. Irwin
*President, CEO*

Andrew N. Rowan, Ph.D.
*Senior Vice President/Chief of Staff*

G. Thomas Waite III
*Treasurer, CFO*

Patricia A. Forkan
*Executive Vice President*

Roger A. Kindler, Esq.
*Vice President/General Counsel*

**STAFF VICE PRESIDENTS**

Martha C. Armstrong
*Senior Vice President
Companion Animals
and Equine Protection*

John W. Grandy, Ph.D.
*Senior Vice President
Wildlife Programs*

Wayne Pacelle
*Senior Vice President
Communications and
Government Affairs*

Michael C. Appleby, B.Sc., Ph.D.
*Farm Animals and
Sustainable Agriculture*

Katherine Benedict
*Administration, Information
Services, and Technology*

Richard M. Clugston, Ph.D.
*Higher Education*

Randall Lockwood, Ph.D.
*Research and Educational Outreach*

Steve Putnam
*Business Development
and Corporate Relations*

Robert G. Roop, Ph.D., SPHR
*Human Resources and Education*

Melissa Seide Rubin, Esq.
*Field and Disaster Services*

Martin L. Stephens, Ph.D.
*Animal Research Issues*

Richard W. Swain Jr.
*Investigative Services*

Gretchen Wyler
*Hollywood Office*

**DIRECTORS**

Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph.D.
Anita W. Coupe, Esq.
Judi Friedman
Alice R. Garey
David John Jhirad, Ph.D.
Jennifer Leaning, M.D.
Amy Freeman Lee, L.H.D.
Franklin M. Loew, D.V.M.
Eugene W. Lorenz
Jack W. Lydman
William F. Mancuso
Patrick L. McDonnell
Judy J. Peil
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Maurice F. Strong, P.C., C.C., LL.D
John E. Taft
David O. Wiebers, M.D.
Marilyn E. Wilhelm
K. William Wiseman

John A. Hoyt
*President Emeritus*

Murdaugh Stuart Madden, Esq.
*Vice President/Senior Counsel*

NGO in general consultative status
with the Economic and Social Council
of the United Nations

Printed on recycled paper

April 9, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX®Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary. The documents should include, but not be limited to, any guidance that may specify or suggest that different methods are or may be permissible for the potency testing of BOTOX (therapeutic use) versus BOTOX Cosmetic (cosmetic use).

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,

*Loree Macdonald*

Loree Macdonald
Information Specialist
Animal Research Issues

HFDIS (C)
HFS22

# Exhibit 2

045590.txt


HUMANE SOCIETY                          04/19/04
ATTN: L MACDONALD
2100 L ST NW                            In reply refer to:
WASHINGTON, DC 20037                    04005590

Dear Requester:

The Food and Drug Administration (FDA) has received your
Freedom of Information Act (FOIA) request for records
regarding:

    ALLERGAN INC, IRVINE, CA - BOTOX RECS

We will respond as soon as possible and may charge you a
fee for processing your request. If you have any questions
about your request, please call Mary L. Sejas, Lead
Information Technician, at 301-827-6563 or write to us at:

        Food and Drug Administration
        Division of Freedom of Information
        5600 Fishers Lane, HFI-35
        Rockville, MD 20857

If you call or write, use the reference number above
which will help us to answer your questions more quickly.

Page 1

# Exhibit 3

 **U.S. Food and Drug Administration** 

### CENTER FOR BIOLOGICS EVALUATION AND RESEARCH

FDA Home Page | CBER A-Z Index | CBER Search | Contact CBER | CBER Home Page

Blood | Vaccines | Cellular/Gene Therapy | Tissue | Devices
Products | Industry | Healthcare | Reading Room | Meetings | What's New

# Transfer of Therapeutic Products
# to the Center for Drug Evaluation and Research

On June 30, 2003, FDA transferred some of the therapeutic biological products that had been reviewed and regulated by the Center for Biologics Evaluation and Research (CBER) to the Center for Drug Evaluation and Research (CDER). CDER now has regulatory responsibility, including premarket review and continuing oversight, over the transferred products. In regulating the products assigned to them, CBER and CDER will consult with each other regularly and whenever necessary.

On October 1, 2003, the staff comprising CBER's Office of Therapeutics Research and Review also transferred to CDER. CDER created two new offices to accommodate the former CBER staff:

- the Office of Drug Evaluation VI, within CDER's Office of New Drugs, and
- the Office of Biotechnology Products, within CDER's Office of Pharmaceutical Science.

For further information about the organizational structure of the two new offices in CDER, see www.fda.gov/cder/biologics/default.htm.

**Mailing addresses**

Beginning October 4, 2004, all **submissions for therapeutic biological products** (EXCLUDING 21 CFR 600.80 postmarketing adverse experience reports; advertising and promotional labeling; and 21 CFR 600.14 biological product deviation reports) **that have been transferred to CDER** should be sent to:

> CDER Therapeutic Biological Products Document Room
> Center for Drug Evaluation and Research
> Food and Drug Administration
> 12229 Wilkins Avenue
> Rockville, MD 20852

All **submissions for biological products that remain in CBER** should continue to be sent to:

> Center for Biologics Evaluation and Research
> Food and Drug Administration
> 1401 Rockville Pike, Suite 200N
> Rockville, MD 20852-1448

**The lists below identify categories of therapeutic biological products transferred from CBER to CDER, and categories of therapeutic biological products remaining in CBER.** Please note that the CBER list contains only a portion of the products CBER currently regulates; this list contains products that are closely related in chemical structure to products that transferred to CDER, e.g. therapeutic proteins and polysaccharides. Products are included on the CBER list as a means of clarifying the products that transferred and those that did not.

Product information for the product classes transferring to CDER have been relocated to the CDER web

site. A list of specific products transferring to CDER is provided.

Product information for the product classes remaining in CBER will remain on the CBER web site.

**Categories of Therapeutic Biological Products Transferred to CDER**

- Monoclonal antibodies for in-vivo use
- Proteins intended for therapeutic use, including cytokines (e.g. interferons), enzymes (e.g. thrombolytics), and other novel proteins, except for those that are specifically assigned to CBER (e.g., vaccines and blood products). This category includes therapeutic proteins derived from plants, animals, or microorganisms, and recombinant versions of these products
- Immunomodulators (non-vaccine and non-allergenic products intended to treat disease by inhibiting or modifying a pre-existing immune response)
- Growth factors, cytokines, and monoclonal antibodies intended to mobilize, stimulate, decrease or otherwise alter the production of hematopoietic cells in vivo [1]

**Categories of Therapeutic Biological Products Remaining in CBER**

- Cellular products, including products composed of human, bacterial or animal cells (such as pancreatic islet cells for transplantation), or from physical parts of those cells (such as whole cells, cell fragments, or other components intended for use as preventative or therapeutic vaccines)
- Vaccines (products intended to induce or increase an antigen specific immune response for prophylactic or therapeutic immunization, regardless of the composition or method of manufacture)
- Allergenic extracts used for the diagnosis and treatment of allergic diseases and allergen patch tests
- Antitoxins, antivenins, and venoms
- Blood, blood components, plasma derived products (for example, albumin, immunoglobulins, clotting factors, fibrin sealants, proteinase inhibitors), including recombinant and transgenic versions of plasma derivatives, (for example clotting factors), blood substitutes, plasma volume expanders, human or animal polyclonal antibody preparations including radiolabeled or conjugated forms, and certain fibrinolytics such as plasma-derived plasmin, and red cell reagents

**Combination Products**

The lists above contain some combination products comprised of a biological product component with a device and/or drug component, though such products are not specifically identified. Combination products are assigned to a Center for review and regulation in accordance with the products' primary mode of action. [2] When a product's primary mode of action is attributable to a type of biological product assigned to CDER, the product will be assigned to CDER. Similarly, when a product's primary mode of action is attributable to a type of biological product assigned to CBER, the product will be assigned to CBER. For further information about combination products, see http://www.fda.gov/oc/combination/, or contact the Office of Combination Products at 301-827-9229, or combination@fda.gov.

**Sponsor Information**

| | | | | |
|---|---|---|---|---|
| Files transfering to CDER | BLA | NDA | IND | IDE |
| Files remaining with CBER | BLA | NDA | IND | IDE |

Letter to Sponsors - *(PDF)*, *(Text)*

FEDERAL REGISTER Food and Drug Administration Regulations; Drug and Biological Product Consolidation; Addresses; Final Rule; Technical Amendment - 3/24/2005 - *(PDF)*, *(Text)*

FEDERAL REGISTER Drug and Biological Product Consolidation - **6/26/2003** - *(PDF)*, *(Text)*

Questions about the assignment of specific products to CBER or CDER should be directed to the center jurisdiction officers at

CDER Ombudsman .......................... 301-594-5480

CBER Ombudsman .......................... 301-827-0379

---

**Footnotes**

[1]Growth factors, cytokines, and monoclonal antibodies intended to mobilize, stimulate, decrease or otherwise alter the production of hematopoietic cells in vivo, for the purpose of being harvested for use in the production of a therapeutic cellular or blood product, may be regulated in combination with the therapeutic cellular or blood product, as appropriate. Sponsors of products that fit this description should contact the center jurisdiction officers listed below for guidance on appropriate center assignment.

[2] See 21 U.S.C. § 353(g), section 503(g) of the Federal Food, Drug, and Cosmetic Act.

Updated May 24, 2005

---

CBER Home Page | CBER A-Z Index | CBER Search | Contact CBER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA / Center for Biologics Evaluation and Research



# U.S. Food and Drug Administration

## CENTER FOR BIOLOGICS EVALUATION AND RESEARCH

FDA Home Page | CBER A-Z Index | CBER Search | Contact CBER | CBER Home Page

Blood | Vaccines | Cellular/Gene Therapy | Tissue | Devices
Products | Industry | Healthcare | Reading Room | Meetings | What's New

## Transfer of Therapeutic Products to the Center for Drug Evaluation and Research

### Approved Products Transferring to CDER

| Product Name | Proprietary Name | Applicant Name |
|---|---|---|
| Abciximab | ReoPro | Centocor B.V. |
| Adalimumab | Humira | Abbott Laboratories |
| Agalsidase beta | Fabrazyme | Genzyme Corp |
| Aldesleukin | Proleukin | Chiron Corp |
| Alefacept | Amevive | Biogen, Inc |
| Alemtuzumab | Campath | ILEX Pharmaceuticals L.P. |
| Alteplase | Activase | Genentech, Inc |
| Anakinra | Kineret | Amgen, Inc |
| Anistreplase | Eminase | Wulfing Pharma GmbH |
| Arcitumomab | CEA-Scan | Immunomedics, Inc |
| Asparaginase | Elspar | Merck & Co., Inc |
| Basiliximab | Simulect | Novartis Pharmaceuticals Corp |
| Becaplermin | Regranex | OMJ Pharmaceuticals, Inc |
| Becaplermin Concentrate | | Chiron Corp |
| Botulinum Toxin Type A | BOTOX BOTOX COSMETIC | Allergan, Inc |
| Botulinum Toxin Type B | MYOBLOC | Elan Pharmaceuticals |
| Capromab Pendetide | ProstaScint | Cytogen Corp |
| Collagenase | Santyl | Advance Biofactures Corp |
| Daclizumab | Zenapax | Hoffmann-La Roche Inc |
| Darbepoetin alfa | Aranesp | Amgen, Inc |

CBER Transfer of Therapeutic Products to CDER

| Denileukin diftitox | Ontak | Seragen, Inc |
|---|---|---|
| Dornase alfa | Pulmozyme | Genentech, Inc |
| Drotrecogin alfa (Activated) | Xigris | Eli Lilly & Co |
| Epoetin alfa | Epogen | Amgen, Inc |
| Epoetin alfa | Eprex | Ortho Biologics LLC |
| Etanercept | Enbrel | Immunex Corp |
| Filgrastim | Neupogen | Amgen, Inc |
| Ibritumomab tiuxetan | Zevalin | IDEC Pharmaceuticals Corp |
| Indium In-111 Chloride Sterile Solution | Indium In-111 Chloride Sterile Solution | Mallinckrodt Medical, Inc |
| Indium In-111 Chloride Sterile Solution | Indiclor | Medi-Physics, Inc |
| Infliximab | Remicade | Centocor, Inc |
| Interferon alfa-2a | Roferon A | Hoffmann-La Roche Inc |
| Interferon alfa-2b | Intron A | Schering Corp |
| Interferon alfacon-1 | Infergen | InterMune, Inc |
| Interferon alfa-n3 (Human Leukocyte Derived) | Alferon N Injection | Interferon Sciences, Inc |
| Interferon beta-1a | Avonex | Biogen, Inc |
| Interferon beta-1a | Rebif | Serono, Inc |
| Interferon beta-1b | Betaseron | Chiron Corp |
| Interferon gamma-1b | Actimmune | InterMune, Inc |
| Laronidase | Aldurazyme | Biomarin Pharmaceutical Inc |
| Muromonab-CD3 | Orthoclone OKT3 | Ortho Biotech Products, LP |
| Nofetumomab | Verluma | Boehringer Ingelheim Pharma KG |
| Omalizumab | Xolair | Genentech, Inc |
| Oprelvekin | Neumega | Genetics Institute, Inc |
| Palivizumab | Synagis | MedImmune, Inc |
| Pegaspargase | Oncaspar | Enzon, Inc |
| Pegfilgrastim | Neulasta | Amgen, Inc |
| Peginterferon alfa-2a | Pegasys | Hoffman-La Roche Inc |
| Peginterferon alfa-2b | PEG-Intron | Schering Corp |
|  |  |  |

| Rasburicase | Elitek | Sanofi-Synthelabo, Inc |
| Reteplase | Retavase | Centocor, Inc |
| Rituximab | Rituxan | Genentech, Inc |
| Rituximab Formulated Bulk (For Further Manufacturing Use) | | IDEC Pharmaceuticals Corp |
| Sargramostim | Leukine | Berlex Laboratories, Inc |
| Satumomab Concentrate (For Further Manufacturing Use) | | LONZA Biologics plc |
| Satumomab Pendetide | OncoScint CR/OV | Cytogen Corp |
| Streptokinase | Streptase | Aventis Behring GmbH |
| Tenecteplase | TNKase | Genentech, Inc |
| Tositumomab and Iodine I 131 Tositumomab | Bexxar | Corixa Corp |
| Trastuzumab | Herceptin | Genentech, Inc |
| Urokinase | Abbokinase | Abbott Laboratories - Pharmaceutical Products Division |

Updated July 2, 2003

CBER Home Page | CBER A-Z Index | CBER Search | Contact CBER
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility | HHS Home Page

FDA / Center for Biologics Evaluation and Research

# Exhibit 4

# THE HUMANE SOCIETY
## OF THE UNITED STATES

**OFFICERS**

David O. Wiebers, M.D.
Chair of the Board

Anita W. Coupe, Esq.
Vice Chair

Amy Freeman Lee, Litt.D.
Secretary

Paul G. Irwin
President, CEO

Patricia M. Forkan, Ph.D.
Senior Vice President/Chief of Staff

G. Thomas Waite III
Treasurer, CFO

Linda A. Hatch
Assistant Vice President

Roger A. Kindler, Esq.
Vice President/General Counsel

**STAFF VICE PRESIDENTS**

Martha C. Armstrong
Senior Vice President
Companion Animals
and Equine Protection

John W. Grandy, Ph.D.
Senior Vice President
Wildlife Programs

Wayne Pacelle
Senior Vice President
Communications and
Government Affairs

Michael C. Appleby, B.Sc., Ph.D.
Farm Animals and
Sustainable Agriculture

Katherine Bendett
Administration, Information
Services and Technology

Richard M. Clugston, Ph.D.
Higher Education

Randall Lockwood, Ph.D.
Research and Educational Outreach

Steve Putnam
Business Development
and Corporate Relations

Robert G. Roop, Ph.D. SPHR
Human Resources and Education

Melissa Seide Rubin, Esq.
Field and Disaster Services

Marion L. Stephens, Ph.D.
Animal Research Issues

Richard W. Swain, Jr.
Investigative Services

Gretchen Wyler
Hollywood Office

**DIRECTORS**

Patricia Mares Asip
Peter A. Bender
Leonard W. Castren, Ph.D.
Anita W. Coupe, Esq.
Judi Friedman
Alice R. Garey
O. J. Ramsay Jones, Ph.D.
Jennifer Leaning, M.D.
Amy Freeman Lee, Litt.D.
Eugene W. Lorenz
Jack W. Lyceman
William E. Mancuso
Patrick L. McDonnell
Judy J. Peil
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Marian F. Stamp, P.C., D.Litt.D.
John E. Taft
David O. Wiebers, M.D.
Marilyn E. Wilhelm
K. William Wiseman

**DIRECTORS EMERITI**

Jane K. Ivory

**President Emeritus**

Murdaugh Stuart Madden, Esq.
Vice President/General Counsel

July 26, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary.

This is the HSUS' second request for this information. Our initial request, dated April 9, 2004, yielded little pertinent information; rather, FDA sent two printouts from the internet that did not address any of our questions (see enclosures). Also, we have made several attempts to contact FDA employees by phone to discuss potency issues, but we have been unsuccessful. We would appreciate full disclosure of non-proprietary information relating to the potency testing of Botulinum toxin type A.

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,

*Loree Macdonald*

Loree Macdonald
Information Specialist
Animal Research Issues

Enc.