**PLAINTIFF'S EXHIBIT 9**

# THE HUMANE SOCIETY
## OF THE UNITED STATES.

**OFFICERS**
David O. Wiebers, M.D.
*Chair of the Board*
Anita W. Coupe, Esq.
*Vice Chair of the Board*
Eugene W. Lorenz
*Board Treasurer*
Wayne Pacelle
*President & CEO*
G. Thomas Waite III
*Treasurer & CFO*
Roger A. Kindler, Esq.
*General Counsel & CLO*

**STAFF VICE PRESIDENTS**
Andrew N. Rowan, Ph.D.
*Executive Vice President Operations*
Michael Markarian
*Executive Vice President External Affairs*
Patricia A. Forkan
*Senior Vice President International Programs & Regions*
Martha C. Armstrong
*Senior Vice President Domestic Animal Programs*
John W. Grandy, Ph.D.
*Senior Vice President Wildlife & Habitat Protection*
Heidi Prescott
*Senior Vice President Campaigns*
Michael C. Appleby, B.Sc., Ph.D.
*Farm Animals*
Katherine Benedict
*Administration, Information Services, & Technology*
Nicholas Braden
*Communications*
Richard M. Clugston, Ph.D.
*Higher Education*
Randall Lockwood, Ph.D.
*Research & Educational Outreach*
Jonathan R. Lovvorn, Esq.
*Animal Protection Litigation*
Steve Putnam
*Business Development*
Robert G. Roop, Ph.D., SPHR
*Human Resources & Education Programs*
Melissa Seide Rubin, Esq.
*Field & Disaster Services*
Martin L. Stephens, Ph.D.
*Animal Research Issues*
Richard W. Swain Jr.
*Investigative Services*
Gretchen Wyler
*Hollywood Office*

**DIRECTORS**
Leslie Lee Alexander
Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph.D.
Anita W. Coupe, Esq.
Neil Fang
Judi Friedman
Alice R. Garey
David John Jhirad, Ph.D.
Jennifer Leaning, M.D.
Eugene W. Lorenz
William F. Mancuso
Patrick L. McDonnell
Judy Ney
Judy J. Peil
Marian Probst
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Walter J. Stewart, Esq.
John E. Taft
David O. Wiebers, M.D.
K. William Wiseman

John A. Hoyt
Paul G. Irwin
*Presidents Emeriti*

Murdaugh Stuart Madden, Esq.
*Vice President & Senior Counsel*

Printed on 100% post-consumer recycled paper, processed chlorine free and Green Seal and FSC certified, with soy-based ink

April 28, 2005

Bill Pierce
Deputy Assistant Secretary for Public Affairs
Department of Health and Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

                                         Re:    **Freedom of Information Act Appeal**

Dear Mr. Pierce

       The Humane Society of the United States (The HSUS) hereby appeals the constructive denial of a July 26, 2004 request under the Freedom of Information Act, 5 U.S.C. § 552 <u>as amended</u> for copies of "all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. (Attachment A).

       Pursuant to the Freedom of Information Act (FOIA) and the FDA's own regulations, the agency has 20 working days to respond to a FOIA request. 21 CFR §20.41 (2005). To date, The HSUS has received no response to this request.

       The HSUS sent a similar FOIA request on April 09, 2004, (Attachment B) to which it received a partial response consisting of two documents printed off the FDA website. The first one is found at http://www.fda.gov/womens/gethefacts/botox.html, and the second one is found at http://www.fda.gov/fdac/features/2002/402_botox.html. (Attachment C). The information provided in these two web documents is very general and does not address the request which specifically asks for "regulations, directives, policy statements, recommendations, guidance documents, and similar documents."
The HSUS did not appeal the FDA's inadequate response to the April 9, 2004 request. Rather, The HSUS sent a new request on July 26, 2004. It is that request that has gone entirely unanswered.

**Promoting the protection of all animals**
2100 L Street, NW, Washington, DC 20037 ▪ 202-452-1100 ▪ Fax: 202-778-6132 ▪ www.hsus.org

Accordingly, The HSUS hereby appeals the agency's constructive denial of this FOIA request. The HSUS does not seek proprietary information or information that falls under any other exemption covered by FOIA, and there is no justifiable basis for the agency withholding this information. Furthermore, this information is vital to The HSUS's ongoing monitoring of animal research in the United States, and its attempts to make sure individual companies are complying with the Animal Welfare Act, 7 U.S.C. § 2141 *et seq*. The agency's delay in providing access to such information frustrates what the Supreme Court has identified as the "basic policy" of the FOIA, i.e., to "shed[] light on an agency's performance of its statutory duties." Dept. of Justice v. Reporters Comm. For Freedom of the Press, 489 U.S. 749, 774 (1989).

The HSUS would like to make arrangements to obtain all of the requested information as soon as possible. However, if, within twenty working days, the agency has not made arrangements to provide us with the requested records, we will assume that this appeal has been denied, and that our only remaining recourse is to file an action in federal district court to seek an order compelling disclosure.

Please let me know if you have any questions regarding this appeal.

Sincerely,

Peter J. Petersan
Deputy Director
Animal Protection Litigation

Enc.

# ATTACHMENT A

# THE HUMANE SOCIETY
## OF THE UNITED STATES

**OFFICERS**
David O. Wiebers, M.D.
*Chair of the Board*
Anita W. Coupe, Esq.
*Vice Chair*
Amy Freeman Lee, Litt.D.
*Secretary*
Paul G. Irwin
*President, CEO*
Andrew N. Rowan, Ph.D.
*Senior Vice President/Chief of Staff*
G. Thomas Waite III
*Treasurer, CFO*
Patricia A. Forkan
*Executive Vice President*
Roger A. Kindler, Esq.
*Vice President/General Counsel*

**STAFF VICE PRESIDENTS**
Martha C. Armstrong
*Senior Vice President*
*Companion Animals*
*and Equine Protection*
John W. Grandy, Ph.D.
*Senior Vice President*
*Wildlife Programs*
Wayne Pacelle
*Senior Vice President*
*Communications and*
*Government Affairs*
Michael C. Appleby, B.Sc., Ph.D.
*Farm Animals and*
*Sustainable Agriculture*
Katherine Benedict
*Administration, Information*
*Services, and Technology*
Richard M. Clugston, Ph.D.
*Higher Education*
Randall Lockwood, Ph.D.
*Research and Educational Outreach*
Steve Putnam
*Business Development*
*and Corporate Relations*
Robert G. Roop, Ph.D., SPHR
*Human Resources and Education*
Melissa Seide Rubin, Esq.
*Field and Disaster Services*
Martin L. Stephens, Ph.D.
*Animal Research Issues*
Richard W. Swain Jr.
*Investigative Services*
Gretchen Wyler
*Hollywood Office*

**DIRECTORS**
Patricia Mares Asip
Peter A. Bender
Donald W. Cashen, Ph.D.
Anita W. Coupe, Esq.
Judi Friedman
Alice R. Garey
David John Jhirad, Ph.D.
Jennifer Leaning, M.D.
Amy Freeman Lee, Litt.D.
Franklin M. Loew, D.V.M.
Eugene W. Lorenz
Jack W. Lydman
William F. Mancuso
Patrick L. McDonnell
Judy J. Peil
Joe Ramsey, Esq.
Jeffery O. Rose
James D. Ross, Esq.
Marilyn G. Seyler
Maurice F. Strong, P.C., C.C., LL.D.
John E. Taft
David O. Wiebers, M.D.
Marilyn E. Wilhelm
K. William Wiseman

John A. Hoyt
*President Emeritus*

Murdaugh Stuart Madden, Esq.
*Vice President/Senior Counsel*

HSUS in general consultative status
with the Economic and Social Council
of the United Nations

July 26, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary.

This is the HSUS' second request for this information. Our initial request, dated April 9, 2004, yielded little pertinent information; rather, FDA sent two printouts from the internet that did not address any of our questions (see enclosures). Also, we have made several attempts to contact FDA employees by phone to discuss potency issues, but we have been unsuccessful. We would appreciate full disclosure of non-proprietary information relating to the potency testing of Botulinum toxin type A.

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,

Loree Macdonald
Loree Macdonald
Information Specialist
Animal Research Issues

Enc.

**Promoting the protection of all animals**
2100 L Street, NW, Washington, DC 20037 ▪ 202-452-1100 ▪ Fax: 202-778-6132 ▪ www.hsus.org

# ATTACHMENT B

April 9, 2004

Betty B. Dorsey
Director, FOI Staff
5600 Fishers Lane (HFI-30)
Rockville, MD 20857

Dear Ms. Dorsey:

The Humane Society of the United States (HSUS) hereby requests copies of all documents related to the FDA's guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX®Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA. By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary. The documents should include, but not be limited to, any guidance that may specify or suggest that different methods are or may be permissible for the potency testing of BOTOX (therapeutic use) versus BOTOX Cosmetic (cosmetic use).

This request for records is made under the federal Freedom of Information Act (FOIA), 5 U.S.C. 522, and applicable agency regulations.

The FOI Act provides that if portions of a document are exempt from release, the remainder must nevertheless be segregated and disclosed. Accordingly, please provide all nonexempt portions of the records requested and justify deletions, if any, by reference to the specific provisions of the FOI Act.

The HSUS is prepared to pay lawful search and duplication fees incurred in connection to this request. However, we request a waiver of these fees, as provided by the FOI Act, U.S.C. 522 (a)(4)(A), and by applicable agency regulations. The HSUS is a 501 c-3 organization, (tax exempt #8399-71925-01), and makes this request as part of its ongoing efforts to promote the humane care and treatment of all animals, including those for whose protection Congress has enacted specific legislation.

Information obtained by The HSUS is routinely compiled, analyzed, and disseminated to the Society's national membership, and to the general public through the media. If however, you do not grant this request for a waiver, and fees are incurred in excess of $200.00, please notify me so that I may obtain authorization for a larger expenditure or appeal your decision.

Please feel free to contact me at (301) 258-8252 if you have any questions.

Sincerely,


Loree Macdonald
Information Specialist
Animal Research Issues

# ATTACHMENT C



DEPARTMENT OF HEALTH AND HUMAN SERVICES                    Public Health Service

 

                                                                                                        Food and Drug Administration
                                                                                                        College Park, MD 20740

Loree Macdonald
The Humane Society of the United States
2100 L Street, NW
Washington, DC   20037

                                                   F04-5590


Dear Ms. Macdonald:

In response to your request of   April 9, 2004     for information pertaining to BOTOX (therapeutic use) and BOTOX Cosmetic (cosmetic use).

We wish to point out that Botox Cosmetic is considered to be a drug. The use of the word Cosmetic in the name of the drug does not refer to any cosmetic application, but rather to the use of the drug for procedures known as "cosmetic surgery."


__xx__ Enclosed are the records you requested.

_____ We have searched our files and find no responsive information.

_____ Your request is also being referred to one of our component offices.

_____ In order to help reduce processing time and costs, certain material has been deleted from the record(s) furnished to you because a preliminary review of the records indicated that the deleted information is not required to be publicly disclosed. If, however, you desire to review the deleted material, please make an additional request at the following address: Food and Drug Administration, Freedom of Information Staff, HFI-35, 5600 Fishers Lane, Rockville, MD 20857. Should the Agency then deny this information, you would have the right to appeal such denial. Any letter of denial will explain how to make this appeal.

Charges will be included in a monthly invoice if your request(s) total more than $15.00. If your monthly total is LESS than $15.00, the material is free. Please DO NOT send payment until you receive an invoice for the total monthly fee.

Reproduction $.60    Search $9.00   Review  0    Other  0    Total: $9.60

THE ABOVE TOTAL MAY NOT REFLECT THE FINAL CHARGES FOR THIS REQUEST.

                                                     Sincerely yours,

                                                     FOI OFFICER
                                                    Executive Operations Staff
                                                    Center for Food Safety
                                                    and Applied Nutrition

Enclosure

U.S. Food and Drug Administration
FDA Consumer magazine
July-August 2002
Table of Contents

Email this Page 
To a Friend

# Botox Cosmetic: A Look at Looking Good

*By Carol Lewis*

The promise of a more youthful look was too tempting for 53-year-old Mary Schwallenberg to pass up. So, when the Food and Drug Administration approved a product that temporarily improves the appearance of frown lines between the eyebrows, the Orlando, Fla., resident took a shot at it. And it wasn't long before she became one of many people clamoring for regular treatments that often include refreshments and friendly conversation, as well as injections.



Botulinum Toxin Type A (Botox Cosmetic) is a protein complex produced by the bacterium *Clostridium botulinum,* which contains the same toxin that causes food poisoning. When used in a medical setting as an injectable form of sterile, purified botulinum toxin, small doses block the release of a chemical called acetylcholine by nerve cells that signal muscle contraction. By selectively interfering with the underlying muscles' ability to contract, existing frown lines are smoothed out and, in most cases, are nearly invisible in a week.

Botox injections are the fastest-growing cosmetic procedure in the industry, according to the American Society for Aesthetic Plastic Surgery (ASAPS). In 2001, more than 1.6 million people received injections, an increase of 46 percent over the previous year. More popular than breast enhancement surgery and a potential blockbuster, Botox is regarded by some as the ultimate fountain of youth.

Schwallenberg, a pharmaceutical sales representative who is excited about her next round of injections, says she wants to look her best for her job. "That's corporate America for you," she says. "I have a lot of energy and I just wanted to look good."

Botox was first approved in 1989 to treat two eye muscle disorders--uncontrollable blinking (blepharospasm) and misaligned eyes (strabismus). In 2000, the toxin was approved to treat a neurological movement disorder that causes severe neck and shoulder contractions, known as cervical dystonia. As an unusual side effect of the eye

disorder treatment, doctors observed that Botox softened the vertical frown (glabellar) lines between the eyebrows that tend to make people look tired, angry or displeased. But until this improvement was actually demonstrated in clinical studies, Allergan Inc., of Irvine, Calif., was prohibited from making this claim for the product.

By April 2002, the FDA was satisfied by its review of studies indicating that Botox reduced the severity of frown lines for up to 120 days. The agency then granted approval to use the drug for this condition.

The FDA regulates products, but not how they are used. Approved products are sometimes used by a licensed practitioner for uses other than those stated in the product label. Botox Cosmetic, for example, is currently being used by physicians to treat facial wrinkles other than those specified by the FDA. Consumers should be aware, however, that this "off-label" use has not been independently reviewed by the agency, and the safety and effectiveness of Botox injections into other regions of the face and neck, alone or in combination with the frown-lines region, have not been clinically evaluated.

Ella L. Toombs, M.D., a dermatologic medical officer in the FDA's Office of Cosmetics and Colors, says, "Careful deliberation, investigation and evaluation is undertaken by the agency before any prescription product is approved." Drugs such as Botox, which are not indicated for serious or life-threatening conditions, "are subject to a greater level of scrutiny because of the benefit-to-risk ratio." Toombs says this means that the FDA may allow someone to incur a greater risk from products that treat medical conditions, rather than from those that are approved for cosmetic purposes.

## Botox 'Parties'

The recent rise in the popularity of Botox has much to do with the manner in which it is frequently marketed. Some practitioners buy the toxin in bulk and arrange get-togethers for people receiving their treatments. As in business, volume discounts can be found in medicine.

Plastic surgery events known as Botox parties--also seminars, evenings and socials--are a key element of Botox marketing in much of the United States. The gatherings are thought to be a convenient means of providing Botox treatments more economically, and may help reduce the anxiety that normally goes along with getting an injection. Doctors are finding that treating people in groups allows them to make the procedure more affordable to their patients.

Here's how a "party" typically works: A group of often nervous, but excited, middle-aged men and women mingle in a common area. Sometimes refreshments are served. One by one, as their name is called, each slips away for about 15 minutes to a private exam room. He or she pays a fee and signs an informed consent agreement. Anesthesia is rarely needed, but sedatives and numbing agents may be available. The practitioner injects about one-tenth of a teaspoon of toxin into specific muscles of

### Considering Botox Cosmetic?

- Be sure that a qualified doctor performs the procedure.
- Make sure that the doctor is trained and qualified in cosmetic skin surgery of the face.
- Ask questions and be informed about the benefits and risks involved in the procedure.
- Avoid alcohol and remain upright for several hours following the procedure.
- Choose a medical

the forehead most often targeted for the effect. The person then rejoins the group.

Scott A. Greenberg, M.D., a board-certified plastic surgeon in Winter Park, Fla., has been hosting monthly "Botox Happy Hours" in his medical office since the drug's approval in April. Greenberg feels that these by-invitation-only events to previous patients "are an opportunity to treat a lot of people at one time in a relaxed but professional atmosphere." Greenberg says there is no difference between treating 10 people during individual office visits throughout the day and treating 10 people individually, but in a more socialized setting. "The important thing is that the identical standards of medical care are maintained at these gatherings as in a routine daytime office consultation."

> setting using sterile techniques. Necessary equipment should be available to respond to any potential problems.
>
> *Source: The American Society for Dermatologic Surgery*

Julianne Clifford, Ph.D., of the FDA's Division of Vaccines and Related Products Applications, explains that "Botox is licensed for marketing and distribution as single-use vials." This means that as packaged, "each vial is intended to be used for a single patient in a single treatment session." Botox does not contain a preservative against potential contamination of the product through repeated use of a single vial. Once opened and diluted, Botox must be used within four hours. Treating multiple people with one vial violates product labeling, which is stated on the package insert, the vial and the carton.

"We lose something when we mass treat," says Franklin L. DiSpaltro, M.D., president of the ASAPS. "One of my concerns is that these parties are a marketing tool--gathering as many patients as possible trivializes a medical treatment, which could deteriorate over time into a nonprofessional environment." DiSpaltro says there's more to medicine "than just dispensing drugs."

Schwallenberg, however, insists that "Dr. Greenberg was very professional. It wasn't a cattle call," she says. "And I don't think I'd go to a doctor I didn't know."

The FDA is concerned that Botox has the potential for being abused. The ASAPS recently reported that unqualified people are dispensing Botox in salons, gyms, hotel rooms, home-based offices, and other retail venues. In such cases, people run the risks of improper technique, inappropriate dosages, and unsanitary conditions. "Botox is a prescription drug that should be administered by a qualified physician in an appropriate medical setting," says Toombs.

Greenberg agrees. "Patient safety has to be of prime concern," he says. "People need to be in the right hands when complications arise." That's why Greenberg does not allow his staff to administer Botox treatments. Even the most skilled health-care providers, he says, can have complications as well as dissatisfied customers.

Although there is no chance of contracting botulism from Botox injections, there are some risks associated with the procedure. If too much toxin is injected, for example, or if it is injected into the wrong facial area, a person can end up with droopy eyelid muscles (ptosis) that could last for weeks. This particular complication was observed in clinical trials.

Other common side effects following injection were headache, respiratory infection, flu syndrome, and nausea. Less frequent adverse reactions included pain in the face, redness at the injection site, and muscle weakness. These reactions were generally temporary, but could last several months.

While the effects of Botox Cosmetic don't last, still, people don't seem to mind repeating the procedure every four to six months in order to maintain a wrinkle-free look. Battling the signs of aging in a non-invasive way, after all, is part of the allure of the product--that and the fact that there are no unsightly scars, and that there is very little recovery time with the procedure.

The FDA recommends that Botox Cosmetic be injected no more frequently than once every three months, and that the lowest effective dose should be used.

## For More Information:

American Academy of Dermatology
P.O. Box 4014
Schaumburg, IL 60168-4014
1-888-462-3376

American Society for Dermatologic Surgery
5550 Meadowbrook Drive, Suite 120
Rolling Meadows, IL 60008
1-800-441-2737

American Society for Aesthetic Plastic Surgery
11081 Winners Circle
Los Alamitos, CA 90720
1-888-272-7711

Table of Contents | How to Subscribe | Back Issues | Editorial Questions

FDA/Office of Public Affairs
Web page created by clb 2002-JUN-25.



FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA

*TAKE TIME TO CARE*

**GET HIGH-QUALITY GRAPHIC VERSION [PDF]**

# Botox™

Botox™ is used to improve the look of mild to severe frown lines for a short time.

### What is Botox™?

- Botox™ comes from a kind of bacteria. The bacteria can make you very sick. But doctors have found that the chemical in Botox™ can also help treat some health problems. They have been using it safely for many years.

### How does Botox™ work?

- Some wrinkles are caused when a muscle contracts (tightens up). Botox™ is injected through the skin into the muscle with a needle. The Botox™ keeps the muscle from contracting. When the muscle can't contract, the wrinkle doesn't show as much.

### You mean you can't move your muscles?

- A trained doctor will inject small amounts of Botox™ into a small part of the muscle. Only that muscle can't move.

### What happens over the long term?

- The action of Botox™ lessens with time. So the muscle returns to normal within a few months. You begin to see the wrinkle again.

### How was this found?

- Botox™ was approved by the FDA (Food and Drug Administration) over 10 years ago to treat certain diseases of the eye muscle. Doctors noticed that some wrinkles around the eyes looked better, too. The company that makes Botox™ tested it. They showed the FDA that Botox™ worked and was safe for treating certain types of wrinkles.

### Are there any side effects? Yes.

- Side effects may include:
- Droopy eyelids, which can last for a few weeks
- Flu-like symptoms
- Headache and nausea (upset stomach)

(REMEMBER: Botox™ is a drug, not a cosmetic.)

**Are Botox Parties Safe?**

> Botox™ is approved for selling in single-use tubes. Each tube is made to be used only once and only for one patient. Using the tube more than once can spread germs. Treating more than one person with one tube goes against the product directions. Also, Botox™ needs to be used within 4 hours after the tube is opened.

### What should I do if I want to try Botox™?

- Make sure you get treatment in a doctor's office or hospital. Make sure your doctor is trained and "takes time to care."

### Thinking about Botox?

- Be sure that a skilled doctor does the treatment.
- Make sure the doctor is trained in cosmetic skin surgery of the face.
- Ask about the benefits and risks of the treatment.
- Choose a medical setting where everything is kept clean and germ-free.
- Emergency equipment should be on hand in case of a problem.
- Do not drink alcohol and do not lie down for several hours after the treatment.

*To learn more:*

American Academy of Dermatology Phone: 1-888-462-3376

American Society for Dermatologic Surgery Phone: 1-800-441-2737

FDA Talk Paper: "FDA Approves Botox To Treat Frown Lines"
www.fda.gov/bbs/topics/ANSWERS/2002/ANS01147.html

FDA Consumer article: "Botox Cosmetic: A Look at Looking Good"
www.fda.gov/fdac/features/2002/402_botox.html

*October 2003*

---

Get the Facts Index
FDA Home Page | Search FDA Site | FDA A-Z Index | Contact FDA | Privacy | Accessibility

FDA Office of Women's Health