## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE HUMANE SOCIETY OF THE UNITED STATES**, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | )     Civ. No. 05-01089 (RMU) |
| | ) |
| **UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES FOOD AND DRUG ADMINISTRATION** | ) <br> ) <br> ) |
| | ) |
| Defendant. | ) <br> ) |

### PLAINTIFF'S MOTION FOR RELEASE OF ALL RESPONSIVE NON-EXEMPT RECORDS

As detailed in the attached Memorandum, by this Motion plaintiff The Humane Society of the United States respectfully moves the Court to Order the United States Department of Health and Human Services Food and Drug Administration ("FDA") to produce to plaintiff all non-exempt records responsive to its July 26, 2004 Freedom of Information Act ("FOIA") request concerning FDA's "guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX (therapeutic use) and BOTOX (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA." Not only is plaintiff plainly entitled to the immediate release of these documents under the letter and spirit of the FOIA, 5 U.S.C. § 552(a), but the release of this information will further the public interest as this is a product used by millions of Americans regularly. In support of this motion, Plaintiff submits the accompanying combined memorandum for release of non-exempt records and in opposition to Defendant's motion to stay proceedings.

-1-

Respectfully submitted,

_____

Peter J. Petersan
(D.C. Bar No. 487605)
Jonathan R. Lovvorn
(D.C. Bar No. 461163)
The Humane Society of the United States
2100 L. St., N.W.
Washington, D.C. 20037
(202) 955.3665

Date: September 9, 2005

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THE HUMANE SOCIETY OF THE** | ) |
| **UNITED STATES**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civ. No. 05-01089 (RMU) |
| | ) |
| **UNITED STATES DEPARTMENT OF** | ) |
| **HEALTH AND HUMAN SERVICES FOOD** | ) |
| **AND DRUG ADMINISTRATION,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

**COMBINED MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR RELEASE OF NON-EXEMPT RECORDS AND IN OPPOSITION TO DEFENDANT'S MOTION TO STAY PROCEEDINGS**

**Introduction**

On July 26, 2004, Plaintiff The Humane Society of the United States ("The HSUS") submitted a straightforward Freedom of Information Act ("FOIA") request to the United States Department of Health and Human Services Food and Drug Administration ("FDA" or "agency") seeking records concerning FDA's "guidance on potency testing of the Botulinum toxin type A, more specifically BOTOX® (therapeutic use) and BOTOX® (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA." Today, over <u>one year later</u>, The HSUS has yet to receive the records it has requested, or indeed any substantive response to the July 2004 request. Moreover, in response to this lawsuit, FDA has not offered to disclose non-exempt documents or to work out a schedule whereby The HSUS could receive documents periodically. Instead, FDA has filed a "Motion For An Open America Stay" in which the agency seeks an order relieving it of its statutory obligation to respond to the plaintiff's request within <u>20 working days</u>, and to delay

1

issuing any answer to Plaintiff's July 2004 FOIA request until April of 2006 – approximately 580 days beyond the statutory limit. Because such an approach is patently inconsistent with the letter and spirit of the FOIA, and because the agency has not shown that at least some non-exempt records cannot be released immediately, plaintiff respectfully requests that the stay be denied.

**Background**

A.     **Botulinum Toxin Type A (Botox)**

Botox® Therapeutic and Botox® Cosmetic, which both contain Botulinum Toxin Type A (BTA) (which is among the most poisonous substances known to man) is most commonly used to temporarily smooth out facial wrinkles, though it also has several medical applications. The popularity of the drug is due to its ability to block muscle contractions, thus reducing facial wrinkles. See Declaration of Dr. Martin Stephens at ¶ 12 (Plaintiff's Exhibit 1) (hereinafter "Dr. Stephens Decl."). According to the American Society for Aesthetic Plastic Surgery (ASAPS), Botox injections are the fastest-growing cosmetic procedure in the industry. See The Food and Drug Administration, *Botox Cosmetic: A Look at Looking* Good, FDA Factsheet (Plaintiff's Exhibit 2). In 2001, more than 1.6 million people received injections, an increase of 46 percent over the previous year. Id. In 2003, that number jumped to 2.3 million Botox procedures performed. See The HSUS, *The Beauty Myth: Botox Kills Animals,* HSUS Factsheet (Plaintiff's Exhibit 3). This was a 37% increase from 2002. Id.

BTA is produced naturally by the bacteria Clostridium botulinum. See The HSUS, *BOTOX Fact Sheet*, HSUS Factsheet (Plaintiff's Exhibit 4). Botox manufacturer Allergan, Inc. produces the toxin by growing the bacteria in a fermenter. Id. Because the process used to

produce Botox is crude, the potency of the toxin varies from batch to batch. To standardize the potency of the toxin, each batch is tested using the LD50 Test. See Dr. Stephens Decl. at ¶ 13.

**B.    The Lethal Dose 50% Test (LD50).**

The LD50 test involves giving mice a single injection of the product into their abdominal cavity and observing whether they die within 3-4 days. See Plaintiff's Exhibit 4. The mice are first assigned to one of various dose groups. Id. The aim of the test is to estimate the dose that kills 50% of the animals. Id. The lethal dose ("LD") value is designed as a unit (U) or a Mouse Unit (MU) of potency. Id. Approximately 100 mice have conventionally been used to test each batch of botulinum toxins products.[1] Id.

Depending on the dose injected and the potency of the batch being assessed, the test animals experience differing levels of muscular paralysis and impaired vision. Id. The end point of the LD50 Test is death, usually by suffocation after the respiratory muscles become paralyzed. Id.

**C.    The HSUS's FOIA Request and FDA's Response**

In order to learn more about how FDA guides Allergan, Inc.'s testing of Botulinum toxin type A, plaintiff submitted a FOIA Request to FDA on April 9, 2004. In particular, the request asked for:

> (a) Copies of all documents related to FDA's guidance on potency testing of the Botulinum toxin type A, more specifically Botox® (therapeutic use) and Botox® Cosmetic (cosmetic use), manufactured by Allergan, Inc. of Irvine, CA.

---

[1] While The HSUS believes that these facts and procedures regarding how Botox is made are accurate, it has yet to receive any documents, pursuant to its FOIA, from the FDA that confirm the actual process.

(b) By "guidance," we mean regulations, directives, policy statements, recommendations, guidance documents, and similar documents, whether compliance is mandatory or voluntary.

See Dr. Stephen's Decl. at ¶ 4; Plaintiff's Exhibit 5.

On April 19, 2004, FDA sent The HSUS a letter that confirmed receipt of the April 9, 2004 FOIA request and noted that they would respond as soon as possible.  Nowhere in the April 19 communication did the FDA notify The HSUS that they were allowing themselves an extension of 10 working days due to "unusual circumstances" as required by 5 U.S.C. § 552(a)(6)(B)(i) and 21 C.F.R. § 20.41.  See Dr. Stephen's Decl. at ¶ 5; Plaintiff's Exhibit 6.

On May 17, 2004, Plaintiffs received a form letter with attachments.  See Dr. Stephen's Decl. at ¶ 6; Plaintiff's Exhibit 7.  The form letter stated "[e]nclosed are the records you requested." Plaintiff's Exhibit 7.  Furthermore, it stated that the search and reproduction fees totaled $9.60.  Id.  Nowhere in this letter did FDA indicate that The HSUS request was still being processed or that more records would be coming.  The attachments consisted of two documents that were printed from the FDA web-site.  Id.  One document was entitled "Botox," and the other was entitled "Botox Cosmetic: A Look at Looking Good."  Id.  Neither document satisfied the April 9 FOIA request.  Because there were no other representations that The HSUS would receive more documents or that FDA was still processing the request, The HSUS assumed the FDA completed its request.

Rather than appeal the April 9 FOIA request, The HSUS sent another FOIA request on July 26, 2004, "[i]n an attempt to clarify" the information sought by the organization.  See Dr. Stephens Decl. at ¶ 7.; Plaintiff's Exhibit 8.  This letter requested the same information contained in the April 9 FOIA request.  Plaintiff's Exhibit 8.  Furthermore, it explained that an earlier

4

request was sent and the response was inadequate, and also invited Betty Dorsey, director of the FDA's Freedom of Infomation (FOI) Staff, to contact the requestor if there were any questions. Id.

The second request essentially gave FDA an additional 20 days, double the time statutorily provided, to comply with FOIA request.  Id.  The HSUS never received confirmation of receipt of this request or a decision from FDA as to whether they would complete the request as required by 5 U.S.C. § 552(a)(6)(A)(i) and 21 C.F.R. § 20.41(a)(i).  See Dr. Stephens Decl. at ¶ 8.  Furthermore, the agency did not provide "written notice" that it would give itself a ten working day extension according to 5 U.S.C. § 552(a)(6)(B)(i) and 21 C.F.R. § 20.41(b)(3)(i)(A).  Nor did the agency provide "written notice" to The HSUS giving notification that the agency would require an extension of more than 10 working days, thus giving The HSUS the opportunity to avail itself of its statutory right to "limit the scope of the request so that it may be processed in a shorter time and/or an opportunity to agree on a timeframe longer than the 10 extra working days for processing the request" as required by 5 U.S.C. § 552(a)(6)(B)(ii) and 21 C.F.R. § 20.41(b)(3)(i)(B).  Rather, the FDA did not respond at all to this request.

On April 28, 2005, The HSUS appealed FDA's constructive denial of their July 26, 2004 FOIA request.  See Dr. Stephens Decl. at ¶ 9; Plaintiff's Exhibit 9.  The HSUS received a letter from The Department of Health and Human Services ("HHS"), dated May 5, 2005, in which they acknowledged receipt of the appeal and assigned it number PHS-2K5-A-077. See Dr. Stephens Decl at ¶ 10; Plaintiff's Exhibit 10.  However, The HSUS never received a decision regarding the appeal.  See Dr. Stephens Decl. at ¶ 10.

**D.**    <u>**The Present Litigation**</u>

In light of FDA's refusal to respond to The HSUS's FOIA request of July 26, 2004, The HSUS filed this suit on June 2, 2005, asking the Court to order the release of all responsive records.  <u>See</u> Complaint For Declaratory And Injunctive Relief (filed June 6, 2005) ("Complaint").  FDA filed their Answer on July 8, 2005.  <u>See</u> Defendant's Answer (July 8, 2005) ("Answer").

In their Answer, FDA denies that it violated the FOIA.  However, the agency admits that there was no correspondence or reply to The HSUS's July 26, 2004 FOIA request and that the next time the agency replied to The HSUS was to confirm receipt of its administrative appeal.  <u>See</u> Answer at ¶¶ 16, 18.

In response to this lawsuit, Defendants prepared and filed a "Motion For An Open America Stay" with several affidavits and more than 100 pages of supporting materials arguing that the agency does not have time to even provide an initial response to Plaintiff's FOIA request.  <u>See</u> Defendant's Motion For An Open America Stay (Aug. 12, 2004) ("Defendant's Motion").  Because Defendant has not explained why it cannot provide even a partial release of non-exempt materials, and because it has not met its burden for a complete stay of these proceedings, Plaintiff's Motion should be granted and Defendant's request for a stay should be denied.

<u>**Argument**</u>

As the Supreme Court has emphasized, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  <u>John Doe Agency v. John</u>

Doe Corp., 493 U.S. 146, 152 (1989) (citations omitted).  Thus, FOIA was enacted to "permit access to official information long shielded unnecessarily from public view" by creating a "right to secure such information from possibly unwilling official hands," Environmental Protection Agency v. Mink, 410 U.S. 73, 80 (1973), thereby "open[ing] agency action to the light of public scrutiny." Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citations omitted). "[D]isclosure, not secrecy, is the dominant objective of the Act." Id.

The FOIA, 5 U.S.C. § 552, as amended, requires agencies of the federal government, upon request, to release records to the public, unless one of nine specific statutory exemptions applies.  Although, in "unusual circumstances," an agency may grant itself an extension of ten additional days to respond, upon receiving a FOIA request an agency must respond within twenty working days.  5 U.S.C. § 552(a)(6); see also 21 C.F.R. § 20.41 (requiring notice "in writing" of any unusual circumstances requiring a delayed response).

A.    **The Defendant Has Not Met Its Burden For Issuance Of A Stay**

As noted above, the plain language of the FOIA requires agencies to respond to FOIA requests within twenty working days, and permits an additional twenty working days for the agency to resolve any administrative appeal.  See 5 U.S.C. § 552(a)(6)(B).  As Senator Ted Kennedy explained when the FOIA was initially enacted, "giv[ing] the agency 40 working days, or almost two calendar months [is] more than enough time for any agency to complete the process of finding and reviewing requested documents." See Open America v. Watergate Special Prosecutor Force, 547 F.2d 605, 611, n.11 (D.C. Cir. 1976), quoting Joint Comm. Print,

Freedom of Information Act and Amendments of 1974, 94th Cong., 1st Sess. 178 at 438-39 (1975).[2]

### 1.  The Defendant Is Not Entitled To A Stay Under The "Unusual Circumstances" Exception in  5 U.S.C. 552(a)(6)(B).

Recognizing that there may develop "unusual circumstances" which make responding even within twenty days difficult, Congress included a provision in the FOIA permitting agencies to invoke a ten day extension of the deadline.  See 5 U.S.C. § 552(a)(6)(B).  However, the FOIA requires that, at the very least, the agency must provide "written notice" concerning such an extension, both explaining the "unusual circumstances" requiring the delay, and informing the requestor of when to expect a response.  Id.

Furthermore, if the agency cannot fulfill the request within the extended time period allowed by 5 U.S.C. § 552(a)(6)(B), "the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request." 5 U.S.C. § 552(a)(6)(B)(ii) and 21 C.F.R. § 20.41(b)(3)(i)(B) ("The agency may provide for an extension of more than 10 working days by providing written notice to the requester setting out the reasons for the extension.  The notice also will give the requester an opportunity to limit the scope of the request so that it may be processed in a shorter time and/or an opportunity to agree on a timeframe longer than the 10 extra working days for

---

[2]  As originally enacted, the FOIA required a response within ten working days, but the statute was amended in 1996 to provide agencies more time to respond.  See Pub Law 104-231.

processing the request.").[3]

In this case, the agency is not entitled to an "unusual circumstances" extension because it has not followed the statutory requirement under the FOIA. Thus, as discussed above, the agency did not "extend[] by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched," 5 U.S.C. § 552(a)(6)(B)(i), and it did not allow the requester "to arrange . . . an alternative time frame for processing the request or a modified request." Id. at § 552(a)(6)(B)(ii). To the contrary, it has refused, at every step of the process, to communicate with the requestor as to when the request would be fulfilled or what the requester could do to narrow the scope or range of the request. See Hayden v. U.S. Dept. of Justice, 413 F.Supp. 1285, 1288-89 (D.D.C. 1976)("time extension is to be allowed only where the agency is clearly making a diligent, good-faith effort.").

**2.  The Agency Is Not Entitled To A Stay Under The "Exceptional Circumstances" Exemption In 5 U.S.C. § 552(a)(6)(c)**

The FOIA also provides a limited exception from the 20 day deadline where "the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request." 5 U.S.C. § 552(a)(6)(C)(i); see Open America, 547 F.2d at 610. However, the FOIA was amended in 1996 to narrow the scope of this exception, providing that a "predictable agency workload of requests" does not constitute such an "exceptional circumstance" unless "the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). Thus, Defendants bear the burden of

---

[3]  21 C.F.R. § 20.41(b)(3)(ii) lists the situations in which "unusual circumstances" may exist, none of which include a backlog of FOIA requests.

proving both "due diligence" and "exceptional circumstances."  Id. at § 552(a)(6)(C)(i).

Here, FDA claims that "exceptional circumstances" exist that prevent it from fulfilling The HSUS request within the statutory timeline, but it has not shown that it has been exercising due diligence in responding to the request.  Indeed, the agency has entirely failed to account for the nearly one year delay between The HSUS's first FOIA request and the time the suit was filed.

Thus, as mentioned above the agency did not respond within 20 days to the July 26, 2004 request as to whether it would comply with the request as required by 5 U.S.C. § 552(a)(6)(A)(i). The agency also did not properly invoke its right to extend its deadline by ten days by sending a written notice to The HSUS notifying the requestor of the extension and setting forth  the "unusual circumstances" for the extension as required by 5 U.S.C. § 552(a)(6)(B)(i).  Nor did the agency notify The HSUS that it would not meet any of the statutorily obligated timelines -  in which case it was required to "provide the [requestor] an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request" as required by 5 U.S.C. § 552(a)(6)(B)(ii).  See also, 21 C.F.R. § 20.41(b)(3)(i)(B).  These acts do not constitute "due diligence," but rather a complete failure to carry out the agency's statutory duties under the FOIA.

Moreover, even accepting the agency's claim that it mistakenly considered the July 2004 FOIA request a complaint or a follow up to an earlier request, rather than a new request, its claim for not responding "[b]ecause Plaintiff's request was still being processed by DIDP," Defendant's Motion at 3, ignores the fact that this critical information was never conveyed to

10

The HSUS.  See Dr. Stephens Decl. at ¶ 8.  Furthermore, even if the agency considered the April 9, 2004 request to still be pending, as it claims, it still violated FOIA and agency regulations by not providing notice in writing that it was granting itself an additional 10 days or that it could not meet any of the deadlines, in which case it was required to give The HSUS an opportunity to either "limit the scope of the request . . . and/or an opportunity to agree on a timeframe longer than the 10 extra working days." 21 C.F.R. § 20.41(b)(3)(i)(B); see also 5 U.S.C. § 552(a)(6)(B)(ii).  This omission was critical because it deprived The HSUS of its statutory right to limit or narrow the request – rather than having the request dropped into a black hole of agency delay.

In short, it could hardly be more clear that the agency simply ignored its legal obligations and instead decided to grant itself an unlimited extension of the FOIA  – which is something the FOIA does not allow, except by Court order.  5 U.S.C. § 552(a)(6)(C)(i) ("If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records.").   Indeed, legislative history of the 1996 FOIA amendments makes clear that "FOIA works best when requesters and agencies work together to define and fulfill reasonable requests.  When a requester can modify a request to make it easier for the agency to process it, this benefits everyone."   H.R. Rep. No. 104-795 at 23-24 (1996).

In this case, the agency has entirely ignored this cooperative mandate, as well as its statutory obligations requiring the agency to communicate with the requester so that it may modify the request in a way that will benefit both parties.  Under these circumstances, the agency's actions can hardly be described as "due diligence."  See Black's Law Dictionary at 468

(7th Ed. 1999) ("Due diligence" means "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation.").

Not only has the agency failed to exercise due diligence in fulfilling The HSUS request, it has also failed to meet the "exceptional circumstance" requirement set forth in 5 U.S.C. § 552(a)(6)(C)(i).  See also Open America, 547 F.2d at 610.  In support of its plea of "exceptional circumstances," the agency relies, in part, on the number of FOIA requests it has received as being unduly burdensome, and presents declarations that list how many FOIA requests the agency has received by the Director of the Division of Information Disclosure Policy ("DIDP") since 2001.  However, these declarations show that in 2001, 2002, 2003, and 2004 the agency has received 6,690, 5,628, 5,310, and 5,156 requests respectively.  Defendant's Motion at 8.  In other words, the numbers have remained fairly constant over the last 5 years.  However, 5 U.S.C. § 552(a)(6)(C)(ii) specifically provides that "exceptional circumstances" does not include delays from a "predictable workload" of FOIA requests, "unless the agency demonstrates reasonable progress in reducing its backlog of pending requests."  Id.  Indeed, Open America specifically recognized that "exceptional circumstances exist' when an agency . . . is deluged with a volume of requests for information vastly in excess of that anticipated by Congress."  Open America at 616.  In enacting the 1996 FOIA amendments, Congress stated point blank that:

> "[b]acklogs of requests for records under the FOIA should not give agencies an automatic excuse to ignore the time limits.  The development of agency administrative processes to respond to specific types of requests on an expedited basis and for encouraging agencies to cooperate with requestors to frame more targeted requests is critical to using agency FOIA resources in the most efficient manner possible."

H.R. 104-795 at 14 (1996) (emphasis added).

In short, the FOIA requests received by the agency in the past few years were not only foreseeable and predictable, but also precisely the type of "predictable workload" that both Congress and the courts have made clear do not constitute "exceptional circumstances." See Hamlin v. Kelley, 433 F.Supp 180 (N.D. Ill 1977); Hayden v. U.S. Dept. of Justice, 413 F.Supp. 1285 (D.D.C. 1976) (where agency was under several court orders enforcing requests and responsive records and documents consisted of 114 volumes containing 18.000 pages, did not constitute "exceptional circumstances").

Nevertheless, Defendant cites to a litany of cases in support of their argument that they should obtain an Open America stay due to "exceptional circumstances." See Defendant's Motion at 15. However, many of these cases are distinguishable and inapplicable to the case here. For example, Defendant cites to several cases that mention in passing that a stay under Open America was granted at one point in the case, but cases do not analyze the particular facts to determine if a stay is warranted. See Piper v. U.S., 339 F.Supp.2d 13 (D.D.C. 2004); Williams v. FBI, 2000 WL 1763680 (D.D.C. Nov. 30, 2000); Judicial Watch of Florida, Inc. v. U.S. Dept. of Justice, 102 F. Supp. 2d 6 (D.D.C. 2000). Many of the other cited cases were decided before the 1996 FOIA amendments changed the timeline which altered the response time in favor of the agency. See Edmond v. U.S. Attorney, 959 F. Supp. 1 (D.D.C. 1997); Jiminez v. FBI, 938 F. Supp. 21 (D.D.C. 1996); Ohaegbu v. FBI, 936 F. Supp. 7 (D.D.C 1996). FDA also cites to a case where the defendant was dealing with a backlog of "tens of thousands of other requests," Rubin v. U.S. Dep't of State, 980 F. Supp 116, 122 (E.D.N.Y. 1997), which obviously stands in stark contrast to the "approximately 4,800" requests FDA is complaining about here. See Defendant's Motion at 17.

13

Finally, the line of cases relied on by the FDA to support its showing of "exceptional circumstances" has been primarily those involving the Department of Justice, or more specifically the FBI.  See, e.g.,  Williams, 2000 WL 1763680; Judicial Watch of Florida, Inc., 102 F. Supp. 2d 6; Edmond, 959 F. Supp. 1; Jiminez, 938 F. Supp. 21; and Ohaegbu, 936 F. Supp. 7. However, a review of various agency's annual FOIA reports shows that the number of requests received by FDA are not comparable to those received by the Department of Justice ("DOJ").  For example, in the 2004 fiscal year, The FDA received 18,676 initial requests, see FDA Annual Freedom of Information Act Report Fiscal Year 2004 (Plaintiff's Exhibit 11,) only twenty-five percent of which were directed to DIDP.  Defendant's Motion at 8 n5.  By contrast the DOJ received 57,346 during the same time period.  See United States Dep't of Justice Annual Freedom of Information Act Report Fiscal Year 2004, Sect. V (Plaintiff's Exhibit 12). Thus, at least at first glance, it appears that FDA's FOIA burden is substantially less than those faced by the agencies in Williams, Judicial Watch, Edmond, Jiminez, and Ohaegbu.

**B.    The Court Should Order FDA To Release Non-Exempt  Documents**

Because the FDA has not shown that "exceptional circumstances" exist which prevent it from disclosing the requested documents and because the agency has not demonstrated "due diligence" in fulfilling The HSUS's request, the agency should be directed to release all non-exempt records.  Even if the Court believes that "exceptional circumstances" exist with regard to the agency's ability to release all documents, there is no justification for the agency's failure to release some non-exempt documents promptly.

As the Supreme Court has made clear, the time limits established by the FOIA are unambiguous and must be given effect by the Court.  See Hartford Underwriters Ins. Co. v.

Union Planters Bank, N.A., 530 U.S. 1, 6 (2000) ("when the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms") (internal citations and quotations omitted). Thus, under circumstances not unlike those presented here, the court in Natural Res. Def. Council v. Dep't of Energy granted plaintiff's motion for the release of responsive records in large part because the Department of Energy was "woefully tardy" in responding to plaintiff's FOIA request. 191 F. Supp. 2d 41, 42 (D.D.C. 2002). In particular, the court chastised the Department of Energy because, "after making a virtually meaningless release of some form letters . . . the Department has done little of substance – apart from collecting and organizing responsive documents – to respond to Plaintiff's request," which had been submitted 11 months earlier. Id. at 42-43. Similarly, in this case, The HSUS has also received "a meaningless release" of documents printed from the FDA website, and it is clear that the agency has done nothing in the intervening 12 months, nor even complied with its statutory obligation to notify The HSUS of the agency's actions and the HSUS's option of narrowing the request.

Finally, even if the Court finds that the agency has met its burden under Open America, release of non-exempt records should still be ordered under the "exceptional need or urgency" language of Open America, 547 F.2d at 615. As the court in Open America explained:

> We believe that Congress intended for a district court to require an agency to give priority to a request . . . if some exceptional need or urgency . . . justified putting it ahead of all other requests . . . . This is, of course, on the assumption that the agency can be shown to be exercising due diligence.

547 F.2d at 615. The Court was concerned, however, that there may be some inequity involved in ordering a requestor to be moved to the front of the line, if there are other requesters who have been waiting as long, if not longer. 547 F.2d at 614. But Plaintiffs submit that this is not the case here.

-15-

Rather, in this case, the equities weigh in favor of moving Plaintiff's request to the front of the line. As in Dep't of Energy, there is substantial public interest in the documents at issue because they are necessary to fulfill essential Congressional and administrative mandates to reduce, refine and replace animal testing. In 1985, "Congress amended the Animal Welfare Act . . . and incorporated . . . the Three Rs – the replacement, reduction, and refinement of animal testing." Dr. Stephens Decl. at ¶ 25. Furthermore, the European Union ("EU") has enacted legislation that is leading to the phasing out of animal testing "through both a ban on such testing in the EU and a ban on marketing products in the EU that have been so tested, regardless of whether the testing occurred outside the EU, such as in the US." Dr. Stephens Decl. at ¶ 20.

Accordingly, in 1997, the federal government established the Interagency Coordinating Committee on the Validation of Alternative Methods ("ICCVAM"), which Congress made a permanent committee through the ICCVAM Authorization Act of 2000. Id. at ¶ 34. The FDA is a member of ICCVAM. Since 1998, "numerous influential bodies have published reports or held conferences promoting the use of 'humane endpoints' and discouraging the use of death as an endpoint in testing." Dr. Stephens Decl. at ¶ 28. Among these groups and agencies are the National Institutes of Health ("NIH"), the U.S Institute for Laboratory Animal Research, the Organization for Economic Cooperation and Development ("OECD"), and the Canadian Council on Animal Care. Id.

The HSUS works with several of these organizations, both private and governmental, such as FRAME and ICCVAM,[4] to help refine, reduce and replace animal experimentation - not

---

4 "The HSUS and Frame gave a joint presentation on Botox testing at the 5[th] World Congress on Alternatives and Animal Use in the Life Sciences. Informal conversations with [European Centre for the Validation of Alternative Methods] ECVAM staff suggest a coordinated strategy involving ECVAM and ICCVAM to tackle the problem." Dr. Stephens Decl. at ¶¶ 42-43

only for the purpose of improving animal welfare, but also to help develop scientific tests that are safer and more reliable for the public.  See generally Dr. Stephens Decl.  The FDA's refusal to release the requested information not only hampers The HSUS's ability as an organization to work on these issues, but also hinders the work of the national and international coalitions that The HSUS and the United States government are involved in.  Id.  Furthermore, it frustrates and undercuts Congress' clear intent in the 1985 Animal Welfare Act Amendments to ensure that the reduction, replacement, and refinement of animal testing be carried out promptly, as well as its decision to establish the ICCVAM to carry out this mandate.  It also prevents meaningful insight and participation with international organizations on this issue.  Indeed, The LD50 test has been widely criticized for being inconsistent with Congress' mandate to reduce, refine and replace animals testing, and "has been heavily criticized for using large numbers of animals per test, using death as an endpoint, as well as being unreliable and largely irrelevant to human health concerns."  Id. at ¶ 21.  Moreover, the OECD which promulgates internationally recognized guidelines for the testing of industrial chemicals -- deleted the LD50 test from its 2002 guidelines.  Id. at ¶ 22.  the United States is a member of this International body.[5]

Moreover, many consumers are interested in the requested information insofar as it contributes to the current scientific and policy debate concerning the issue of animals in research.  Animal testing is an important issue of public policy as indicated by the market demand for "cruelty free" cosmetics which led to such companies as Revlon to donate $750,000

---

[5] Despite all the work that government agencies, both here and abroad, are doing to replace, reduce and refine needless animal testing, in 2003, a UK organization, Fund for the Replacement of Animals in Medical Experiments ("FRAME") revealed that "the LD50 Test is used to assess the potency of batches of BOTOX."  Id. at ¶ 37.  This is what prompted the The HSUS to file a FOIA request with FDA.

to Rockefeller University in 1979.  <u>See</u> Karen Lee Stevens, *Animal Testing Alternatives* (Plaintiff's Exhibit 13).  Other companies followed and soon the John Hopkins Center for the Alternatives to Animal Testing ("CAAT"), The International Foundation for Ethical Research, the Cosmetic, Toiletry, and Fragrance Association, and the Soap and Detergent Association all started their own animal testing alternative programs voluntarily.  <u>Id.</u>  This consumer demand shows a strong public interest in the prompt disclosure of the requested information.

Finally, The HSUS has approximately 9 million members and supporters nation-wide, works with other organizations both nationally and internationally, and is in contact with other government agencies who are working on replacements for animal experimentation.  <u>See generally</u> Dr. Stephens Decl.  Filling Plaintiff's request may not only prevent further requests regarding the same issue from being submitted, but may also help alleviate the backlog that the FDA now faces, since many of The HSUS 9 million members and constituents may also have pending requests on this issue.

In light of the compelling public interest in disclosure of the requested information, as well as the complete lack of any justification for FDA's failure to fully respond to The HSUS request long before now, Plaintiff requests that this Court order FDA to immediately disclose all responsive, non-exempt documents.  <u>See</u> <u>Dep't of Energy</u>, 191 F. Supp. 2d at 43; <u>see also</u> <u>Am. Civil Liberties Union v. Dep't of Def.</u>, 339 F. Supp. 2d 501, 505 (S.D.N.Y. 2004) (ordering the Department of Defense to release documents . . . when "[n]early one year ha[d] passed since the documents were first requested" and "[t]o permit further delays in disclosure or providing justification for not disclosing would subvert the intent of FOIA").  This relief will contribute in

-18-

a timely way to the public's understanding of this important issue, facilitate the accomplishment

of an important Congressional mandate, and may actually reduce FDA's backlog of requests.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Defendant's Motion for

a stay be denied, and that Defendant be directed to provide all non-exempt records responsive to

Plaintiff's FOIA request within thirty days.


Respectfully submitted,


_____
Peter J. Petersan
(D.C. Bar No. 487605)
Jonathan R. Lovvorn
(D.C. Bar No. 461163)
The Humane Society of the United States
2100 L. St., N.W.
Washington, D.C. 20037
(202) 955.3665

Date: September 9, 2005