# PLAINTIFF'S EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE HUMANE SOCIETY OF THE UNITED STATES,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES FOOD AND DRUG ADMINISTRATION,<br><br>Defendant. | Civ. A. No. 05-01089 (RMU) |

## DECLARATION OF MARTIN STEPHENS, Ph.D.

I, Martin Stephens, declare as follows:

1. I am the Vice President for Animal Research Issues at The Humane Society of the United States (HSUS), in Gaithersburg, Maryland.

2. I graduated from the City University of New York with a B.S. (1978) and from The University of Chicago with an M.S. (1981) and Ph.D. (1984); all degrees were in Biology, with specialization in behavioral ecology.

3. I direct The HSUS' advocacy efforts that address the use of animals in research, testing, and education. We seek to promote methods of research, testing, and education that accomplish one or more of the Three Rs, namely, replace or reduce animal use in specific procedures or refine procedures to limit animal suffering.

## FOIA REQUEST TO USDA

4. By letter dated April 09, 2004, my HSUS colleague, Ms. Loree Macdonald, at my direction, requested information concerning the FDA's guidance on potency testing

1

of BOTOX. See Plaintiff's Exhibit 5.

5. The FDA responded to our request by letter dated April 19, 2004, in which it acknowledged receipt of our request. It stated that it would respond as soon as possible and assigned the request number 04005590. The FDA did not request an extension to fill the request. See Plaintiff's Exhibit 6.

6. The FDA sent a follow-up letter identified as F04-5590 in which it supplied The HSUS with two documents printed from its web-site that were unresponsive to the request. The letter stated "enclosed are the records you requested." Nowhere did the letter indicate that more records were forthcoming. See Plaintiff's Exhibit 7.

7. In an attempt to clarify our request, by letter dated July 26, 2004, my HSUS colleague, Ms. Loree Macdonald, at my direction, sent a new FOIA request for information concerning the FDA's guidance on potency testing of BOTOX. The request noted that "[b]y 'guidance,' we mean regulations, directives, policy statements, recommendations, guidance documents and similar documents, whether compliance is mandatory or voluntary." See Plaintiff's Exhibit 8.

8. To date The HSUS has received no response at all to the July 26, 2004 request.

9. By letter dated April 28, 2005, The HSUS appealed the constructive denial of the July 26, 2004 request relating to the potency testing of BOTOX. The appeal clarified that The HSUS was not seeking information exempted by FOIA or any proprietary information. See Plaintiff's Exhibit 9.

10. To date The HSUS has only received one letter acknowledging receipt of the

2

appeal referred to in paragraph 9 and assigned the appeal an identification number of PHS-2K5-A-077. See Plaintiff's Exhibit 10.

11. More than 20 working days have past, and no substantive response has been received, nor has The HSUS received any responsive documents.

### WHAT LITTLE WE KNOW ABOUT POTENCY TESTING OF BOTOX

12. Botox® Therapeutic and Botox® Cosmetic are manufactured by Allergan Incorporated of Irvine, CA. Both are sometimes referred to simply as Botox®. They both contain the same active ingredient, Botulinum Toxin Type A (BTA) (which is among the most poisonous substances known to man. Botox® Therapeutic has several medical applications but Botox® Cosmetic is FDA-approved only to temporarily smooth out certain facial wrinkles. The popularity of the drug is due to its ability to block muscle contractions, thus reducing facial wrinkles.

13. In 2003, the Fund for the Replacement of Animals in Medical Experiments (or FRAME) published an expose[1] which revealed that the potency of new batches of Botulinum products, including BOTOX Theraperutic and BOTOX Cosmetic, are routinely assessed using the $LD_{50}$ Test.[2]

14. In a letter dated February 13, 2004, Douglas Ingram, Executive Vice President, General Counsel and Secretary of Allergan, wrote to me that "Allergan is currently required by regulators globally to use the LD50 assay as part of its BOTOX® batch release process for the product's therapeutic and cosmetic indications." In the same letter, Mr. Ingram also stated that "...working with regulatory agencies, Allergan has been

---

[1] "Growing Old Disgracefully: the Cosmetic Use of Botulinum Toxin," ATLA [Alternatives to Laboratory Animals] 31: 381-391 (2003).
[2] The LD50 [Lethal Dose 50 Percent] Test uses large numbers to derive a statistical estimate of the dose of a chemical that would cause 50% of the animals to be killed.

3

devoting significant time and resources toward the development of an alternative assay that may one day replace the LD50 assay."

15. In 2004, Allergan advertised to fill the position of "Microbiologist LD50" to, in part, "assist in qualifying a contract laboratory for LD50 potency testing...."

16. In a January, 2005 monograph entitled "Botulinum Toxin Type A for Injection,"[3] the European Pharmacopeia wrote that the "potency of the reconstituted [Botulinum toxin type A] product is determined by an LD50 assay or by a method validated with respect to the LD50 assay." With respect to methods other than the $LD_{50}$ assay, the monograph further stated: "After validation with respect to the LD50 assay (reference method), the product may also be assayed by other methods that are preferable in terms of animal welfare..." and goes on to list three examples.

17. In a letter dated March 9, 2005 to Congressman David Price (4th District, North Carolina), Patrick Ronan, FDA Assistant Commissioner for Legislation, wrote that "At this time, the most effective method to monitor the potency of the product [BOTOX and BOTOX Cosmetic] is the mouse $LD_{50}$ assay."

18. In a letter dated March 14, 2005 to me, the Acting Commissioner of Food and Drugs, Dr. Lester Crawford, wrote that "The LD50 assay is a mouse bioassay that was developed to assess the potency of the botulinum neurotoxin products. It is currently the only reliable method for determining the number of units of botulinum neurotoxin in these products."

## PUBLIC POLICY, THE LD50 TEST, AND PRODUCTS WITH A COSMETIC USE

19. In 1959, British scientists William Russell and Rex Burch published a

---

[3] http://online.pheur.org

framework for addressing animal welfare concerns about the use and suffering of animals in testing. Their principles, now known as the Three Rs or alternative methods, include replacing animals with non-animal methods for specific tests, reducing animal use in specific tests, and refining animal tests so that animals experience less suffering, wherever feasible.

20. Since at least 1980, animal testing for any products used for cosmetic purposes has been the target of high-profile animal welfare campaigns in the US and Europe. The European Union (EU) has legislation that is leading to the phasing out of animal testing of cosmetics through both a ban on such testing in the EU and a ban on marketing products in the EU that have been so tested, regardless of whether the testing occurred outside the EU, such as in the US.

21. For decades, the LD50 Test has been an especially controversial animal test, regardless of whether the substance being tested is a cosmetic or other type of product. It has been heavily criticized for using large numbers of animals per test, using death as an endpoint, as well as being unreliable and largely irrelevant to human health concerns.

22. The OECD which promulgates internationally recognized guidelines for the testing of industrial chemicals, adopted a test guideline on the LD50 Test ("Test Guideline 401: Acute Oral Toxicity ($LD_{50}$ Test)") in 1981. This was a variation of what was later called the "classical" LD50 Test. The OECD revised this guideline in 1987 to reduce animal numbers, adopted three other animal tests for acute oral toxicity during the 1990s, and finally deleted the LD50 Test from its guidelines altogether in 2002. (The US is a member country of the OECD.)

23. In 1983, the FDA sponsored an Acute Studies Workshop to discuss agency

5

testing requirements including the uses of and the rationale for LD50 tests. It concluded that although FDA requires acute toxicity data for new compounds, it does not require the data be acquired through the "classical" LD50.

24. In 1984, the FDA established a Steering Committee on Animal Welfare Issues to determine if the agency is directly or indirectly perpetuating the use of the "classical" LD50; the committee concluded that the FDA was not perpetuating its use.

25. In 1985, Congress amended the Animal Welfare Act and incorporated Russell and Burch's principles of the Three Rs—the replacement, reduction, and refinement of animal testing.

26. In 1986, an FDA survey indicated a 96% decrease in the use of the "classical" LD50 test in 1985 compared with the period 1975-1979.

27. In response to a petition from animal welfare organizations petition, FDA agreed in 1986 to announce that "the 'classical' LD50 test is not a required procedure for use in safety determinations within the agency."

28. Since 1998, numerous influential bodies have published reports or held conferences promoting the use of "humane endpoints" and discouraging the use of death as an endpoint in testing. These bodies have included the National Institutes of Health, the (U.S.) Institute for Laboratory Animal Research, the Organization for Economic Cooperation and Development ("OECD") (of which the U.S. is a member), and the Canadian Council on Animal Care.

29. In 1988, the FDA published its promised policy statement on the LD50. "The scientific community agrees that the 'classical' LD50 test is not necessary for determining acute toxicity. In agreement, FDA has adopted the policy that the 'classical'

LD50 test is not a required toxicity study. The agency supports efforts to eliminate continued conduct of the 'classical' $LD_{50}$ test and to reduce the numbers of animals used in acute toxicity testing without sacrificing information necessary in the interest of human safety."

30. In 1989, The U.S. Interagency Research Animal Committee, which included representatives of a cross-section of relevant federal agencies, including the FDA, reviewed the policies and recommendations of federal agencies and international organizations concerning the LD50 Test, and issued recommendations for limiting its use. All of the federal entities surveyed, including the FDA, Environmental Protection Agency ("EPA"), Department of Transportation ("DOT"), the Consumer Product Safety Commission ("CPSC"), and National Toxicology Program (NTP"), did not require or use the classical LD50 test or they discouraged its use.

31. In 19991, the European Commission created the European Center for the Validation of Alternative Methods ("ECVAM") to promote the development and evaluation of non-animal testing methods.

32. In 1992, FDA issued a position paper on "Animal Use in Testing FDA-Regulated Products," which stated: "Much of the attention given to animal testing has focused on the LD50 tests. FDA does not require LD50 test data to establish levels of toxicity...."

33. In 1997, scientists at the British National Institute for Biological Standards and Control, published their research on a promising replacement for LD50 testing for Botulinum toxin potency testing.

34. In 1997, the federal government established the Interagency Coordinating

Committee on the Validation of Alternative Methods ("ICCVAM"), the U.S. counterpart to ECVAM. Congress made ICCVAM a permanent committee through the ICCVAM Authorization Act of 2000.

35. In 1999, UK's Home Office discontinued issuing licenses for LD50 testing where a suitable alternative is available.

36. Following its 2000 workshop on acute toxicity, ICCVAM—of which the FDA is a member—published a *Guidance Document on Using In Vitro Data to Estimate In Vivo Starting Doses for Acute Toxicity*, which recommends that non-animal tests should be used to estimate the starting dose for animal-based acute toxicity testing, which can lead to a further reduction in animal numbers per test.

37. In 2003, The UK-based Fund for the Replacement of Animals in Medical Experiments (FRAME) revealed that the LD50 Test is used to assess the potency of batches of BOTOX.

38. In 2003, ECVAM held a Workshop on Strategies to Replace *In Vivo* Acute Systemic Toxicity Testing.

39. In 2004, North Carolina Congressman David Price wrote to then Deputy Commissioner Lester Crawford out of concern over LD50 testing of BOTOX.

40. In 2005, the European Pharmacopoeia published a monograph on botulinum toxin type A that states: "After validation with respect to the LD50 assay (reference method), the product may also be assayed by other methods that are preferable in terms of animal welfare, including 1 of the following: 1. endopeptidase assay in vitro; 2. ex vivo assay using the mouse phrenic nerve diaphragm; 3. mouse bioassay using paralysis as the end-point."

41. In a letter to me dated March 14, 2005, the then Acting Commissioner of Food and Drugs, Dr. Lester Crawford, wrote that the "FDA fully supports the development and use of non-animal tests that can be used to evaluate the safety of products that will be used in humans" and that "FDA has encouraged sponsors to develop alternatives to the mouse LD50 assay" for Botulinum toxin products.

42. In 2005, HSUS had informal conversations with ICCVAM officials about LD50 testing of Botox Cosmetic; out of those conversations came the recommendation to nominate the mouse bioassay as a target for ICCVAM's alternatives work.

43. In 2005, a representative of FRAME and I gave a joint presentation on Botox testing at the 5th World Congress on Alternatives and Animal Use in the Life Sciences. Informal conversations with ECVAM staff following the presentation led to the suggestion of a coordinated strategy involving ECVAM and ICCVAM to tackle the problem.

44. The HSUS and its members are harmed in several ways by the FDA's refusal to disclose the requested information, as is our ability to work with other agencies and groups on the LD50/Botox problem. Given this refusal, we lack critical details of the current method of assessing the potency of Botox. Consequently, we lack confirmation that the current method is the much criticized "classical" version of the LD50 Test; if we had such confirmation, we could demonstrate that such testing goes against the spirit of decades of U.S. public policy. We lack confirmation that the current method uses death as its endpoint, which runs counter to public policy on the promotion of humane endpoints. We lack confirmation of the number of animals used per test, which would give us a better sense of the scale of animal use for this purpose. We are thereby

hampered in making our case to ICCVAM and ECVAM that finding alternatives to LD50 testing of Botox Cosmetic warrants the deployment of their limit resources. For similar reasons, we are hampered in our ability to convince other animal protection organization to address this issue with us. Most importantly, we lack information on the FDA's position on how such potency testing should be carried out and what concrete steps the agency has taken to replace, reduce, or refine animal use for this purpose. Thus we cannot challenge an agency position that remains secret, nor can we determine whether Allergan is complying with any pro-alternative guidance that the agency may have provided to Allergan.

45. Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury that the foregoing is true and correct.

_____
Martin Stephens, Ph.D.
Vice President, Animal Research Issues
The Humane Society of the United States

Executed on September 9, 2005, in Gaithersburg, Maryland

10